**BURLINGTON NORTHERN RAILROAD COMPANY, a corporation, and The Fort Worth and Denver Railway Company, a corporation, Plaintiffs,**

v.

**UNITED TRANSPORTATION UNION, F. A. Hardin, International President; Harold Nelson, Vice President; H. G. Kenyon, Vice President; G. J. Cahill, Vice President; K. L. Levin, Vice President; Robert Hart, General Counsel; and M. A. Duke, J. R. Horn, John Reynolds, F. W. Kruger, G. P. Schiller, M. M. Winter, G. D. Hitz, J. E. Hurley, A. S. Driver, General Chairmen; Robert M. Kluge, Gerald P. Wold, Jerome L. Nelson, Local Chairmen, St. Paul, Minnesota; D. L. Brown, R. J. Daurer, D. S. Hill and R. W. Linroth, Local Chairmen, Chicago, Illinois, Defendants.**

No. 82 C 2248.

United States District Court, N. D. Illinois, E. D.

May 5, 1982.

---

Richard J. Schreiber, Thomas J. Knapp, Chicago, Ill., for plaintiffs.

John J. Naughton, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

### FINDINGS OF FACT

1. On April 13, 1982, at approximately 6:00 a. m. CST, members of the United Transportation Union (UTU) struck the Burlington Northern Railroad Company (BN).[1]

2. After the strike commenced, Mr. Egbers, BN's Vice President of Labor Relations, contacted two UTU officials, Mr. Hitz and Mr. Duke, and was told by them that the reasons for the strike were:

the § 6 notices of February, 1982;

the § 6 notices of February, 1981, including Mr. Horn's § 6 notice; and

the § 6 notice of July, 1981, relating to reduced crew payments. (Tr. 8–9)

3. After the strike commenced, Mr. Sheak, assistant to Egbers, also contacted Duke and was told by him that the strike involved the same three issues. (Tr. 57)

4. Mr. Hardin, the International President of the UTU, testified that he is the

1. There is some confusion as to whether the Ft. Worth & Denver Railway Company was also struck, but the court need not make a finding on that question.

one authorized to call a strike and that he authorized this strike over two issues:

the handling of Horn's February, 1981, § 6 notice; and

the § 6 notice of July, 1981, relating to reduced engine crew payments. (Tr. 65–75)

## THE "HORN NOTICE"

5. On February 2, 1981, the various UTU General Chairmen served § 6 notices on BN · and other carriers requesting changes in rates of pay and working conditions.

6. In these notices, which were virtually identical, the UTU requested that the respective national negotiating committees for the railroads and the UTU be authorized to represent each in future negotiations. (See Ex. # 1 to Egbers' Affidavit)

7. The BN agreed to national handling on most of these § 6 notices, but Egbers refused to send General Chairman Horn's notice to the national committee. (Tr. 45)

8. Horn represents BN yardmen, that group of employees who formerly worked as switchmen on the Great Northern. (Tr. 177)

9. The BN chose not to handle Horn's notice nationally because the employees he represented had failed to ratify an agreement entered into by other committees. (Tr. 171)

10. The BN served counter-proposals on the UTU shortly after it received the February 2, 1982 notices.

11. On March 3, 1981, Horn met with Egbers and Sheak regarding his notice, at which time Horn agreed to wait while Egbers worked on the national negotiations. (Tr. 166)

12. On March 17, 1981, Horn fortuitously ran into Egbers and asked for another meeting. Egbers replied that he would get in touch. (Tr. 166)

13. No further contact between the two occurred until October 27, 1981, at which time Horn sent Egbers a letter requesting a meeting. He received no reply. (Tr. 167)

14. Horn, through President Hardin, invoked mediation on his notice in early 1982 and was given Mediation Case No. A–10908. A mediation meeting was set for March 2, 1982. (Tr. 167)

15. On February 24, 1982, Horn received a telegram informing him that the mediation had been cancelled. (Tr. 167–68)

16. On February 25, 1982, Horn met with Egbers, who told him that his notice had been sent to the national committee for national handling in October, 1981. Egbers also stated that he had discovered that he had failed to inform Horn of this at the time. (Tr. 168–69)

17. Horn responded by letter of March 2, 1982, protesting BN's change of mind over local vs. national handling. (Tr. 169)

18. On March 9, 1982, Egbers sent Horn a letter in which he indicated that he had never received Horn's letter of October 27th requesting another meeting. (Tr. 175)

19. On April 5, 1982, representatives of BN and UTU, including Egbers and Horn, met to discuss the Horn notice. At this meeting, Egbers indicated BN's position as being that national handling of the subject matter of the Horn notice was obligatory. (Tr. 172) ·

20. While these events were occurring, UTU and BN had disagreed over whether the other February, 1981 notices should be handled locally or nationally. That dispute is the subject of a lawsuit pending in the federal district court for the District of Columbia, *Atchison, Topeka & Santa Fe Rwy. Co. v. United Transportation Union*, No. 82–0278.

## THE REDUCED CREW PAYMENTS AND

## THE MORATORIUM DEFENSE

21. On July 21, 1981, the UTU served § 6 notices on the BN, requesting that road train or yard service crews working with an engine crew that lacks a fireman ·receive extra compensation, and that firemen working with a reduced train or yard crew receive extra compensation.

22. On July 28, 1981, BN responded in writing that this notice was improper because it was barred by the moratorium provision of the 1980 crew consist agreements. (Pl. Ex. # 3)

23. The BN, however, served counterproposals on UTU and scheduled a meeting for August 21, 1981. (Pl. Ex. # 3)

24. In November, 1981, UTU invoked mediation on this matter and Mediation Case No. A–10870 was assigned to it.

25. On March 30, 1982, the parties had a mediation conference at which time Egbers renewed his objection that the notices were barred by the moratorium provision in the crew consist agreements.

26. What happened at this meeting is disputed; Egbers contends that "the parties all agreed that until the issue involving the moratorium could be resolved, that mediation would be in recess," (Tr. 16) and that the moratorium issue was a minor dispute (Egbers' Affidavit ¶ 13), while Mr. McGuire, the UTU representative, asserts that the UTU never agreed to a recess or that the moratorium issue constituted a separate minor dispute. (Tr. 139)

27. After the mediation conference, McGuire went to Egbers' office, and Egbers drafted a letter in which he stated that it was agreed that mediation would be recessed and that he would submit the moratorium issue to the Arbitration Board. (Pl. Ex. # 1)

28. At this time McGuire asked Egbers if there was some way to continue negotiations without submitting the issue to arbitration. (Tr. 143)

29. Egbers understood that it was agreed that he would not submit the issue to arbitration provided the UTU did not strike on that issue. (Tr. 16–17)

30. On April 1, 1982, the National Mediation Board sent out a telegram stating that the mediation was recessed "with the agreement of the parties." (Pl. Ex. # 2)

31. On April 23, 1982, after the UTU struck the BN, Egbers submitted the moratorium issue to the National Railroad Adjustment Board. (Pl. Ex. # 4)

32. The Adjustment Board is considerably behind in handling of the disputes before it. (Tr. 73)

33. The relevant portion of the moratorium provision of the 1980 crew consist agreement states:

Article 22. The parties to this Agreement shall not serve or progress . . . any notice or proposal for changing the specific provisions of this Agreement governing . . . special allowance payment to reduced crew members . . . . (Def. Ex. B)

34. The agreement defines "reduced crew" as "a crew that operates with a conductor (foreman) and one brakeman (helper)." Article 3(d). (Def. Ex. B)

35. It is the policy of the National Mediation Board that, in the event of a dispute as to the legality of the § 6 notices, mediation will be recessed until the dispute is resolved. (Tr. 148–49)

CONCLUSIONS OF LAW

1. The Railway Labor Act, 45 U.S.C. § 151–160, provides an elaborate process for the resolution of disputes between carriers and unions involving various stages: conferences between the union and the railroad, mediation before the National Mediation Board, voluntary arbitration, a mandatory 30 day cooling-off period, and possibly even hearings before a presidentially-created Emergency Board. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

2. This process is deliberately intended to be long-drawn-out; as the Supreme Court has stated:

A final and crucial aspect of the Act [is] the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process.

*Detroit & Toledo Shore Line R. R. v. United Transportation Union,* 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969).

3. "While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.*" *Jackson-*

*ville, supra,* 394 U.S. at 378, 89 S.Ct. at 1115.

4. With regard to the Horn notice, the statutory process has not yet been exhausted; while the BN may have refused to negotiate locally with Mr. Horn, it is not refusing to negotiate through the national committees on the subject matter of his notice.

5. If the UTU objects to the BN's unilateral decision to switch from local to national negotiations on the Horn notice, judicial remedies are available to it; in fact, the pending District of Columbia case may resolve the issue, should that court determine that the parties are obligated to negotiate the notices on a national basis.

6. Such an objection, however, provides no basis for short-circuiting the statutory process and resorting to self-help.

■ 7. Because the UTU has failed to exhaust mediation on the Horn notices, it cannot resort to self-help and it is enjoined from striking on that issue until such time as it has fully exhausted the statutory process.

8. With regard to the UTU's other asserted ground for striking, the special allowance for reduced crews, initially the court must determine whether this dispute is a minor one and properly before the National Railroad Adjustment Board (NRAB), or a major one.

9. Judicial interpretation of the Railway Labor Act has recognized distinctions between major disputes, which are "disagreement[s] in the bargaining process for a new contract," and minor disputes, which are "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation, generally involving only one employee." *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 33, 77 S.Ct. 635, 636, 1 L.Ed.2d 622 (1957). See also *Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 722–728, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945).

10. The Railway Labor Act grants exclusive primary jurisdiction over minor disputes to the NRAB and the Supreme Court has stated that "federal courts ought not to act in such a way as to infringe upon the jurisdiction of the Board." *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co.,* 363 U.S. 528, 532, 80 S.Ct. 1326, 1329, 4 L.Ed.2d 1435 (1960).

■ 11. Accordingly, federal district courts are without authority to determine the merits of a minor dispute; "it [is] not [the district judge's] function to construe the contractual provisions upon which the parties relied for their respective positions on the merits." *Missouri-Kansas-Texas Railroad, supra,* at 533, 80 S.Ct. at 1329.

12. Federal courts do, however, determine whether a dispute is major or minor, *see, e.g., St. Louis Southwestern Railway Co. v. UTU,* 646 F.2d 230 (5th Cir. 1981); *Brotherhood of Locomotive Firemen & Enginemen v. Southern Pacific Co.,* 447 F.2d 1127, 1134 (5th Cir. 1971).

13. In this case, to determine whether the dispute is a major one, as the UTU claims, or a minor one, pursuant to BN's view, this court must examine the asserted moratorium defense.

14. With regard to an asserted moratorium defense, "it is clear under existing law that the possible preclusion of the union's [§ 6 proposal] by the moratorium provision create[s] a 'minor' dispute if the proposal is 'arguably' covered by the provision ... or if the question of preclusion is not 'fictitious or merely colorable.'" *St. Louis Southwestern Railway Co. v. UTU,* 646 F.2d 230, 233 (5th Cir. 1981) (citations omitted).

15. The UTU seeks special allowances for crews working without a fireman. By definition, the moratorium provision upon which BN relies applies to special allowances for crews working with only one brakeman. Thus it is not "arguably" applicable to the UTU's proposal; the question of preclusion in this case is "fictitious or merely colorable."

■ 16. As the asserted defense is at best "merely colorable," the court further concludes that the dispute is not controlled

by the existing agreement and is therefore a major dispute. The submission of the dispute to the NRAB was improper.

17. The UTU argues that BN's position on the reduced crew payment issue precludes it from obtaining injunctive relief, relying on *Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad,* 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944).

18. In that case, the Supreme Court held that the railroad's refusal to submit to voluntary arbitration established that it did not make "every reasonable effort" to settle the dispute and precluded it from obtaining injunctive relief, under the Norris-LaGuardia Act, 29 U.S.C. § 108.

19. The Norris-LaGuardia Act provides in relevant part:

No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law ... or who has failed to make every reasonable effort to settle such dispute....

20. The court concludes that BN's raising of the moratorium defense and threatening to submit the issue to the NRAB [2] does not establish that BN failed to make "every reasonable effort" to settle the dispute or otherwise acted in such a manner to forfeit its right to injunctive relief.

21. Moreover, the court must weigh the harm to the public that would result from a strike against the BN.

22. Accordingly, the court orders the parties to renew mediation before the National Mediation Board on the reduced crew payment issue and enjoins the UTU from striking on that issue until such time as the statutory process has been exhausted.

---

2. The court notes that BN did not actually submit the moratorium issue to the NRAB until

after the UTU had struck the railroad.