**CONSOLIDATED RAIL CORPORATION**

v.

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, et al.**

Civ. A. No. 90–2194.

United States District Court,
E.D. Pennsylvania.

April 4, 1990.

Dennis J. Morikawa, Philadelphia, Pa., for plaintiff.

John O'B. Clarke, Jr., Washington, D.C., for defendants.

### DECISION AND ORDER

VAN ANTWERPEN, District Judge.

This non-jury matter arises out of a suit by plaintiff seeking a preliminary injunction preventing a threatened strike by the defendant union. The plaintiff has brought suit under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* Defendants have filed a counterclaim seeking a declaratory

judgment that, in essence, the plaintiff is negotiating in bad faith. After hearing argument from both sides on March 29, 1990, the court issued a temporary restraining order. The court also required that plaintiff post a $10,000.00 bond, which it has done. Both parties agreed that a further hearing should be held on Tuesday, April 3, 1990.

Consolidated Rail Corporation ("Conrail") brought this action to enjoin the Brotherhood of Maintenance of Way Employees ("BMWE Union"), its officers, representatives and members from engaging in or threatening to engage in any strike, picketing (other than informational picketing), patrolling, slow down, "sick-out" or other work stoppage against Conrail. Members of the BMWE Union maintain Conrail's track, bridges and some buildings. The employees of Conrail are represented by three "Federations" which are subdivisions of the National Union. Conrail was formed in 1976 out of seven bankrupt northeast railroads and now operates railroad freight service in the northeastern United States. If the BMWE Union strikes, it is expected that the other unions which serve Conrail would honor the BMWE Union's picket lines. This would shut down Conrail. Conrail and the BMWE Union have stipulated to the following facts, which we will explain in our discussion:

## STIPULATED FACTS

1. If it were not for the court's intervention and issuance of injunctive relief, [the BMWE Union] would have authorized the Federations of the Brotherhood, which are charged with responsibility to represent employees of Conrail who are covered by collective bargaining agreements between Conrail and the [BMWE Union], to take a strike action against Conrail on March 30, 1990. The situation that led to the [BMWE Union's] action has not been abated, and, thus, a strike action will be authorized if the injunction is lifted.

2. [Conrail] and [the BMWE Union] stipulate that a strike by the [BMWE Union] against Conrail should interrupt interstate rail commerce and cause Conrail to sustain lost revenues that will most likely not be recovered. Defendants do not dispute Conrail's assertion that a strike will cause Conrail irreparable harm.

3. On June 10, 1988, each of the three [BMWE Union] Federations representing Conrail employees served identical notices on Conrail pursuant to Section 6 of the Railway Labor Act. [As set forth in Defendants' Exhibit 1].

4. On July 27, 1988, Conrail served a proposal on the three [BMWE Union] Federations on Conrail, and informed the [BMWE Union] that it had authorized the National Carriers' Conference Committee (NCCC) "to represent and act for it in negotiations with [the BMWE Union] insofar as Attachments A [wages, and health and welfare] and B [Minimum Force and other rules] are concerned." [As set forth in Defendants' Exhibit 2].

5. On May 5, 1989, the [BMWE Union] invoked the mediatory services of the National Mediation Board to assist it in resolving its dispute with carriers represented by the NCCC; that dispute was docketed by the Board as National Mediation Board Case No. A–12252. In its request for mediation, the [BMWE Union] did not list Conrail as one of the carriers which were parties to the [BMWE Union's] national dispute. On May 12, 1989, the NCCC responded to the [BMWE Union's] request for mediation and stated that it "has also been authorized by Conrail to represent it in these national negotiations, in addition to the railroads listed in the [BMWE Union's]" application for mediation. The NCCC then added that: "In our view, the organization's invocation of mediation involving railroads represented by the NCCC includes Conrail. Alternatively, we invoke mediation on behalf of all railroads represented by the NCCC [including Conrail] . . . in this dispute with the [BMWE Union]."

6. On May 16, 1989, the [BMWE Union] invoked the mediatory services of the National Mediation Board with respect to the disputes raised by the three Section 6 notices served on Conrail on June 10, 1988. On May 19, 1989, the National Mediation Board docketed that dispute as National

Mediation Board Case No. A–12260, and asked Conrail to furnish the Board "with any statement [it] ... may care to make...." On May 25, 1989, Conrail responded to the Board's inquiry; a true and accurate copy of that response is [Plaintiff's and Defendants' Joint Exhibit 6].

7. On April 2, 1990, the National Mediation Board, as its last act under Section 5 First of the Railway Labor Act in NMB Case No. A–12252, proffered arbitration in that case.

## DISCUSSION

We will first review the history of this matter. On June 10, 1988, each of the three system federations of the BMWE Union served Conrail with identical Section 6 notices under the Railway Labor Act, containing proposed changes to the existing collective bargaining agreements. The Section 6 notices triggered collective bargaining obligations under the provision of the Railway Labor Act, 45 U.S.C. § 156. The changes proposed by the BMWE Union would have increased job security for BMWE Union members and enhanced certain health and safety benefits. They would also have had the effect of increasing Conrail's labor cost compared with the contracts now in effect.

On July 27, 1988, Conrail served the BMWE Union with its own Section 6 notice. That notice consisted of a one paragraph general statement of Conrail's goals and advised that it would present "[m]ore specific and detailed itemizations of the changes required ... as the discussions proceed." In connection with these notices, representatives of the BMWE Union and Conrail met on September 26, 1988, November 16, 1988, December 22, 1988, January 17, 1989, February 8, 1989, and February 24, 1989.

By letter dated March 8, 1989, C.L. Hopkins, Jr., who was designated by Conrail to serve as its negotiator, served the general chairmen of the BMWE Union with specific proposals to supplement Conrail's July 27 Section 6 notice. These proposals would have reduced some wage levels and benefits from the levels in the current agreement, and would have given Conrail greater flexibility in using BMWE Union members. A significant change was the proposed elimination of restrictions on giving work, now performed by BMWE Union members, to outside contractors. The net result of the proposed changes would be less compensation and employment for BMWE Union members, and labor costs for Conrail which would be lower than under the contract now in effect. The parties met thereafter on April 7, 1989, April 24, 1989 and May 9, 1989, but were unable to reach agreement on each others Section 6 proposals.

In response to the Conrail and BMWE Union Section 6 notices, on May 16, 1989, Geoffrey N. Zeh, President of the BMWE Union, wrote a letter to the National Mediation Board which requested mediation pursuant to Sections Five and Six of the Railway Labor Act, 45 U.S.C. §§ 155 and 156. The National Mediation Board docketed the matter as No. A–12260 and continues to have jurisdiction. The parties involved in this case are Conrail and the BMWE Union as representative of its Conrail Members. Since the Mediation Board took jurisdiction, only one mediation session was held, on October 2, 1989. No agreement was reached at that meeting.

In case No. A–12260 the BMWE Union has requested intensive negotiations, but Conrail has refused. In place of intense negotiations, Conrail has requested arbitration and mediation of all issues. Up until now, the BMWE Union has refused to arbitrate the job security issues. Although it has offered to arbitrate the other issues, Conrail has refused to separate the issues. The question of what, if any, issues are to be arbitrated has not yet been resolved.

Conrail and the BMWE Union agree that case No. A–12260 before the National Mediation Board is local in scope and covers all issues between Conrail and the BMWE Union. The BMWE Union, while alleging the bad faith of Conrail in both its negotiations with the BMWE Union and its corporate policies does not deny that case No. A–12260 which includes all issues, is still un-

der the jurisdiction of the National Mediation Board.

Prior to its letter of May 16, 1989, the BMWE Union on May 5, 1989 wrote a letter to the National Mediation Board requesting mediation under sections five and six of the Railway Labor Act. The National Mediation Board docketed this case as No. A–12252 and will continue to have jurisdiction until the parties formally reject arbitration and the Board notifies them that mediation has failed. 45 U.S.C. § 155 First (b). This case is national in scope and includes many railroads and unions in the United States facing similar issues. By agreement of these unions and railroads, the National Mediation Board has proffered arbitration on April 2, 1990 in case No. A–12252. All these parties, including Conrail and the BMWE Union, agree that this proffer will be rejected. This will allow the National Mediation board to notify the President of the United States and seek creation of a Presidential Emergency Board under Section 10 of the Railway Labor Act, 45 U.S.C. § 160. Assuming the President of the United States takes this step, this Board could investigate the situation and report to the President, following which there is a thirty day cooling off, status quo, no strike period. Conrail maintains that this case includes them as a party and all issues between Conrail and the BMWE Union. The BMWE Union maintains that Conrail and the issues between the BMWE Union and Conrail are not included. We need not resolve these opposing positions because of the existence of case No. A–12260 which includes all relevant parties and all issues.

The BMWE Union conceded at argument that the anti-injunction provisions of Section 4 of the Norris–LaGuardia Act, 29 U.S.C. § 104, do not divest this court of jurisdiction to hear this case. *See Chicago & North Western Ry. v. United Transp. Union, supra,* 402 U.S. 570 at 581, 91 S.Ct. 1731 at 1737, 29 L.Ed.2d 187; *Long Island R.R. v. System Fed'n No. 156, supra,* 368 F.2d 50 at 53 (2nd Cir.1966); *Texas Int'l Airlines v. Air Line Pilots Ass'n,* 518 F.Supp. 203 (S.D.Tex.1981).

Instead, the BMWE Union relies on Section Eight of the Norris–LaGuardia Act, 29 U.S.C. § 108, which says:

**§ 108 Noncompliance with obligations involved in labor disputes or failure to settle by negotiation or arbitration as preventing injunctive relief**

No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

In applying Section 8 to this case, the BMWE Union relies on *Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27 v. Toledo, Peoria & Western Railroad,* 321 U.S. 50, 56, 64 S.Ct. 413, 417, 88 L.Ed. 534 (1944). In that case, after the National Mediation Board had determined that mediation had failed, and pursuant to Section 5 of the Railway Labor Act, had proposed voluntary arbitration. The union accepted, but the railroad refused, although it urged the appointment of an Emergency Board pursuant to the Railway Labor Act. At the end of the thirty day waiting period after failure of mediation, the railroad unilaterally imposed certain changes, and the union struck. The railroad was granted a preliminary injunction, which was affirmed by the Circuit Court of Appeals. In reversing the granting of the injunction, the Supreme Court held that, even though arbitration is not mandatory under the Railway Labor Act, failure to use the available arbitration procedures foreclosed the railroad from obtaining an injunction because of the clean hands provision of § 8 of the Norris LaGuardia Act.

The BMWE Union also relies on *Brotherhood of Railroad Trainmen v. Akron & B.B.R. Co.,* 385 F.2d 581 (D.C.Cir.1967). In that case, involving a major nationwide dispute over the makeup of train crews, the Congress had enacted legislation imposing a settlement for a period of two years. The legislation was silent as to what was to

take place during the two year period and after the two years were up. The legislative history indicated that the Congress contemplated that negotiations would take place during the two year period, based on experience under the award. Prior to the end of the two year period, the union served notices to reopen negotiations pursuant to Section 6 of the Railway Labor Act, 45 U.S.C. § 156. The railroads refused to negotiate, on the ground that they were not required to negotiate until after the expiration of the two year period. The railroads obtained an injunction against self-help by the union. The District of Columbia Circuit, finding that the Section 6 notices were timely, and that the railroads were required to negotiate during the two year period, found that the railroads lacked clean hands, and that therefore the restraining order was erroneously entered. *Id.* at 614.

Before we can determine whether Conrail be considered to be negotiating in good faith, we must first determine whether this is a major or a minor action under the Railway Labor Act, because major and minor actions follow distinctly different procedural paths.

■ In *Elgin, Joliet & Eastern Ry. v. Burley,* 325 U.S. 711, 722–724, 65 S.Ct. 1282, 1289–1290, 89 L.Ed. 1886 (1945), the Supreme Court defined the two types of disputes which can arise under the Railway Labor Act. A *"major* dispute", under Section 2(4) of the Railway Labor Act, 45 U.S.C. § 151a(4):

> relate[s] to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether the existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

*Elgin, supra,* 325 U.S. at 723, 65 S.Ct. at 1290. *Followed in Baker v. United Transp. Union,* 455 F.2d 149, 154 n. 11 (3d Cir.1971); *interpreted in Local 553, Transport Workers Union v. Eastern Air Lines,* 695 F.2d 668 (2d Cir.1982). *See also Consolidated Rail v. Railway Labor Exec. Ass'n,* —— U.S. ——, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). In contrast, a *"minor* dispute"*, under Section 2(5) of the Railway Labor Act, 45 U.S.C. § 151a(5):

> contemplate[s] the existence of a collective bargaining agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or an omitted case.

*Elgin, supra,* 325 U.S. at 723, 65 S.Ct. at 1290. *Accord United Transp. Union v. Penn Central Transp. Co.,* 505 F.2d 542 (3d Cir.1974). Because the issues between the parties involve substantial changes to existing contracts, we find that the parties in the case before us are involved in a major dispute.

The procedures for resolution of major disputes has been described as follows:

> The [Railway Labor] Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may

unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

*Brotherhood of R.R. Trainmen v. Jacksonville Terminal,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). The parties are required to exhaust procedures that "are purposefully long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *Brotherhood of Ry. Clerks v. Florida East Coast Ry.,* 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966).

It is clear from the procedural recitation that negotiations, particularly on the job security issue, have bogged down. The parties are very far apart on fundamental issues. The BMWE Union, having seen the number of its members employed by Conrail drop from approximately 14,000 in 1977 shortly after Conrail was formed to approximately 4000 today, and faced with threats of further staffing reductions, sees its very existence threatened. Conrail, faced with the need to survive without federal subsidy in the very competitive freight transportation industry, feels a compelling need to contain costs. Compromising their positions will not be easy. Each party has taken a different approach to moving the issue. The BMWE Union has requested intense negotiations and threatened a strike. Conrail has requested arbitration. The BMWE Union complains of Conrail's dilatoriness, but as the Supreme Court has said:

> The [Railway Labor] Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

*Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969).

Procedurally, in case No. A–12260, which includes Conrail, the BMWE Union and all issues, the ball is in the National Mediation Board's court. It can press the parties for more intense negotiations, or it can declare that mediation has failed and press the parties to accept arbitration. Until it does the latter, and Conrail has refused to accept arbitration, there is no basis, under *Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad, supra,* to find that Conrail has failed to fulfill its duties under the Railway Labor Act, or to have made every reasonable effort to settle the dispute within the meaning of § 8 of the Norris LaGuardia Act.

Contrary to the BMWE Union's assertion, neither party to labor negotiations under the Railway Labor Act is obligated to agree to the other side's proposals. As the Court of Appeals for the Fifth Circuit has stated:

> It must be kept in mind that [t]here is no compulsion on the parties to agree at any stage of the procedure. *They are not compelled to reach an agreement* by collective bargaining, to follow the recommendations of the Mediation Board, to submit to arbitration or to follow any recommendation which a Presidential Emergency board may make.

*United Industrial Workers of Seafarers Int'l Union v. Board of Trustees of Galveston Wharves,* 400 F.2d 320, 334 (5th Cir.1968), *cert. denied,* 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969) (emphasis added).

It is also clear that a court should not attempt to dictate or control the pace of mediation proceedings before the National Mediation Board. In *Local 808, Building Maintenance, Service & R.R. Workers v.*

*National Mediation Board,* 888 F.2d 1428 (D.C.Cir.1989), the D.C. Circuit held:

> Absent a showing of patent official bad faith, a court has no authority to review the Board's decision to keep a dispute in mediation ... courts have no authority to move a dispute out of mediation except in an "extraordinary and exceptional situation" in which "the Board continues mediation on a *basis that is completely and patently arbitrary and for a period that is completely and patently unreasonable,* notwithstanding the lack of any genuine hope or expectation that the parties will arrive at an agreement."

*Id.* at 1434 (emphasis in original).

In addition to its frustration over the impasse in negotiations, the BMWE Union is upset by recent management decisions by Conrail. Approximately 600 nonagreement employees were given early retirement by March 1, 1990, at a cost of approximately $110 million. This buy-out was financed mainly out of surpluses in the Conrail pension fund, but partly out of Conrail treasury funds. It gave Conrail the benefit of a relatively painless streamlining of its management ranks, by granting a windfall to fortunately placed management employees. It also eliminated surplus cash in its Supplemental Pension Trust Fund, which might have tempted an unfriendly takeover of Conrail.

Another management action was Conrail's purchase in early 1990 of 21 million shares of its own stock at a cost of $1 billion, using treasury funds and debt financing. This, of course, was part of a "poison pill" to thwart a potential unfriendly takeover. During this same time period, Conrail also announced that it intended to spend approximately $300 million to establish an employee stock ownership plan for its nonunion employees and that it had set aside $33 million for consolidation of administrative and operating functions. The BMWE Union is afraid that Conrail's stated plans will significantly reduce the resources available to Conrail and impair its ability to negotiate a settlement with the BMWE Union.

■ It is not the place of this Court to pass upon the wisdom of these management decisions. We find that they do not form a basis for a finding that Conrail has been unreasonable or negotiating in bad faith. For the foregoing reasons, we find that Conrail does not have unclean hands and has standing to seek an injunction against self help by the BMWE Union in this major contractual dispute.

■ It has been held many times under the Railway Labor Act that economic action in support of bargaining demands prior to exhaustion of the Act's major dispute procedures under Sections 5 and 6 is unlawful and enjoinable.[1] *Consolidated Rail Corporation v. Railway Labor Executives' Ass'n, supra,* —— U.S. at ——, 109 S.Ct. at 2480; *Chicago & North Western Ry. v. United Transp. Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *Atlanta & West Point R.R. v. United Transp. Union,* 439 F.2d 73 (5th Cir.), *cert. denied,* 404 U.S. 825, 92 S.Ct. 53, 30 L.Ed.2d 53 (1971); *Long Island R.R. v. System Fed'n No. 156,* 368 F.2d 50 (2d Cir.1966); *American Airlines v. Air Line Pilots Ass'n,* 169 F.Supp. 777 (S.D.N.Y. 1958).

In *Boys Markets v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court held that the federal courts have the authority under the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.,* and the National Labor Relations Act, 29 U.S.C. § 151 *et seq.,* to enjoin a *threatened* strike. In approving issuance

1. As we have noted, we have found that the parties' dispute is a major one. Nevertheless, even if it is not, self-help in minor disputes under the Railway Labor Act is also precluded, for such disputes are within the exclusive jurisdiction of the adjustment boards pursuant to the mandatory arbitration procedures established under Section 204, 45 U.S.C. § 184. Self-help by a union over a minor dispute is also enjoinable. *Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *REA Express, Inc. v. BRAC,* 459 F.2d 226 (5th Cir.), *cert. denied,* 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972); *Local 553, Transport Workers Union v. Eastern Air Lines, supra,* 695 F.2d at 674; *Burlington Northern R.R. v. United Transp. Union,* 539 F.Supp. 988 (N.D.Ill.1982).

of labor injunctions by federal district courts in certain circumstances, the court stated:

> Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or *have been threatened* and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.

*Id.* 398 U.S. at 254, 90 S.Ct. at 1594 (emphasis added) (citing and adopting the position of the dissent in *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 228, 82 S.Ct. 1328, 1346, 8 L.Ed.2d 440 (1962)). Counsel for the defendant BMWE Union stated, at the oral argument preceding the issuance of the temporary restraining order, that the BMWE Union conceded that it was, in fact, threatening a strike, and the stipulated facts contain a similar statement.

We note that to obtain injunctive relief, plaintiffs must establish and the court must conclude that: "(1) plaintiffs are likely to succeed on the merits; (2) plaintiffs are subject to irreparable harm *pendente lite;* (3) defendants will not suffer substantial harm from the grant of an injunction; and (4) the public interest requires that plaintiffs be accorded relief." *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 181 (3d Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). *Accord Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356-57 (3d Cir.1980).

With regard to the first three points, both Conrail and the BMWE Union are entitled, under the Railway Labor Act, to maintain the status quo until the procedures of the Act have been exhausted. Both Conrail and the BMWE Union have stipulated that if there is a strike, Conrail will lose revenue which cannot be recovered and will suffer irreparable harm. We have discussed above the policies underlying the go-slow approach to labor negotiations under the Railway Labor Act. It is sufficient that maintenance of the status quo until exhaustion of the procedures mandated by the Act, comports with the language and policy of the Act.

With regard to the fourth point, Conrail operates rail lines in 15 states, the District of Columbia and one province of Canada. It is the largest rail freight carrier in its territory. In some states, notably Delaware, Pennsylvania, New Jersey, and New York, it is by far the largest rail freight carrier. Many shippers are served only by Conrail. Because of the interconnected nature of the railroad business, any stoppage on Conrail inevitably affects other carriers, including Amtrak and the commuter rail operators. The effect on the public welfare is so great, and so obvious, that it needs no further elaboration.

Pursuant to Fed.R.Civ.P. 65(a)(2), the Court asked both counsel if they agreed that the hearing was a trial on the merits with regard to a final injunction. Counsel for Conrail had no objection to a final injunction. Counsel for the BMWE Union indicated that their only objection to final injunction was that they wished to be free to pursue their counter-claim, that Conrail is, in essence, not bargaining in good faith or with due diligence. Accordingly we will consider this injunction to be a final one. Counsel for Conrail moved for Summary Judgment on the counter-claim at the end of the hearing.

The Court asked counsel for the BMWE Union what additional evidence they might now or later wish to present on the counter claim and he indicated none, other than what they might obtain in discovery. We believe we must grant Conrail's Motion for Summary Judgment at this time. However, we do so without prejudice to the right of the BMWE Union to pursue its counter-claim in the future should the necessary extraordinary or exceptional circumstances arise which would give us authority to further enter this matter. We also do so because the counterclaim issues are equitable in nature and are exactly the same as those we have already decided in ruling on the preliminary injunction.

In addition, we must greet the request of the BMWE Union counsel for discovery at

this time with utmost suspicion. To allow the Court to become involved with this matter, or allow discovery while the issue is pending before the National Mediation Board is totally inconsistent with the holding of *Local 808, Building Maintenance, Service, & R.R. Workers v. National Mediation Board, supra,* absent an "extraordinary and exceptional situation". No such situation is yet present in this case.

## CONCLUSIONS OF LAW

1. Plaintiff Consolidated Rail Corporation and Defendant Brotherhood of Maintenance of Way Employees are parties to a collective bargaining agreement.

2. Conrail and the BMWE Union are engaged in the process of negotiating modifications to that agreement, pursuant to the procedures specified in the Railway Labor Act, 45 U.S.C. § 151 *et seq.*

3. The BMWE Union has threatened to engage in an unlawful strike under the Railway Labor Act in support of its contractual demands.

4. The BMWE Union's threatened strike is likely to occur unless restrained by this court.

5. If the BMWE Union's threatened strike occurs, Conrail will suffer substantial and irreparable injury, as a result of the threatened strike and work stoppage by the BMWE Union.

6. Conrail has no adequate remedy at law.

7. If this preliminary injunction is granted, the injury, if any, to the BMWE Union herein if final judgment be in its favor, would be adequately indemnified by bond.

8. As to each item of relief granted to Conrail herein, greater injury will be inflicted upon Conrail by the denial of such relief than will be inflicted upon the BMWE Union by the granting of such relief.

An appropriate order follows.

## ORDER

AND NOW, this 4th day of April, 1990, upon consideration of the Motion for Preliminary Injunction and after hearing testimony in open court, it is hereby ORDERED that defendant Brotherhood of Maintenance of Way Employees ("BMWE Union"), the individual defendants, individually and collectively, the members of defendant BMWE Union, their officers, agents, servants, representatives and employees, individually and collectively, and all other persons acting in concert with them or otherwise participating in their aid or behalf are ENJOINED from doing the following acts, or any one of them:

1. from calling, instigating, authorizing, encouraging, participating in, approving of or continuing any picketing (other than informational picketing), patrolling, strike, work stoppage, "sick-out" or slowdown, (a) against plaintiff Consolidated Rail Corporation ("Conrail"), or (b) affecting Conrail's operations and all acts in furtherance or in support thereof;

2. from picketing (other than informational picketing) or patrolling the premises on which Conrail conducts its operations, including the entrances and any other places where said premises are situated;

3. from interfering with ingress to and egress from said premises by Conrail's employees and other persons having business with Conrail, including the delivery, unloading, dispatch and movement of rolling stock and equipment and the contents thereof;

4. from loitering or congregating at or near any approaches to said premises and upon any public street or highway leading to and from any place with the employees of Conrail or those having business with Conrail desire to enter or leave enroute to or from said premises;

IT IS FURTHER ORDERED AND DECREED:

1. that the BMWE Union and said other persons are directed to take all steps within their power to prevent said picketing (other than informational picketing), patrolling, strike, work stoppage, "sick-out" or slowdown from occurring or from continuing if commenced;

2. that the BMWE Union is directed to communicate or cause to be communicated

forthwith, to all members of said BMWE Union who are employed by Conrail, by means reasonably calculated to ensure receipt thereof, the fact that an Order has been issued by this court and the contents of that Order;

3. that the BMWE Union is directed to instruct members of said BMWE Union who are employed by Conrail not to engage in any threatened picketing (other than informational picketing), patrolling, strike, work stoppage, "sick-out" or slowdown against Conrail;

4. that the United States Marshal shall enforce this Order;

5. that any violators of this Order shall be brought immediately before this court;

6. that a bond be filed by Conrail in the sum of $10,000.00 conditioned for payment of such costs and damages as may be incurred or suffered by the BMWE Union or other defendants if the BMWE Union or other defendants are found to have been wrongfully enjoined or restrained;

7. that the bond of Fidelity and Deposit Company of Maryland as surety previously filed by Conrail for a Temporary Restraining Order is hereby approved for the purpose of the bond required by paragraph 6;

8. that this Injunction shall continue in full force and effect until further Order of this Court; and

9. that defendant BMWE Union's counter-claim is hereby dismissed without prejudice, consistent with the foregoing Opinion.