CONSOLIDATED RAIL
CORPORATION

v.

BROTHERHOOD OF MAINTENANCE
OF WAY EMPLOYEES

and

Pennsylvania Federation, Brotherhood
of Maintenance of Way Employees

and

Consolidated Rail System Federation,
Brotherhood of Maintenance of
Way Employees

and

Northeastern System Federation,
Brotherhood of Maintenance
of Way Employees

and

M.A. Fleming, President Brotherhood of
Maintenance of Way Employees

and

Jed Dodd, General Chairman Pennsylvania Federation, Brotherhood of Maintenance of Way Employees

and

J.P. Cassese, Sr., General Chairman Consolidated Rail System Federation Brotherhood of Maintenance of Way Employees

and

J.J. Davison, General Chairman Northeastern System Federation, Brotherhood of Maintenance of Way Employees

and

All Officers, Agents, Servants, Members, and Employees of the Brotherhood of Maintenance of Way Employees, the Pennsylvania Federation, Brotherhood of Maintenance of Way Employees, the Consolidated Rail System Federation, Brotherhood of Maintenance of Way Employees, and the Northeastern System Federation, Brotherhood of Maintenance of Way Employees.

Civ. A. No. 91–7260.

United States District Court,
E.D. Pennsylvania.

Dec. 23, 1991.

Benjamin W. Boley, Shea & Gardener, Washington, D.C., John B. Rossi, Jr., Philadelphia, Pa., for plaintiff.

Louis Agre, Brodie, Rubinsky & Agre, Philadelphia, Pa., Harold A. Ross, Ross & Kraushaar, Cleveland, Ohio, for defendants.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

This non-jury matter arises out of a suit by Plaintiff Consolidated Rail Corporation ("Conrail") seeking a preliminary injunction and declaratory relief preventing a threatened strike by the defendant Brotherhood of Maintenance of Way Employees on Conrail. The Plaintiff has brought suit under the Railway Labor Act, 45 U.S.C. § 151 *et*

*seq.* Defendants have filed a counterclaim seeking a preliminary injunction and declaratory relief preventing the Plaintiff from continuing to implement changes to the Railroad Employees National Health & Welfare Plan on January 1, 1992, as mandated by Pub.L. No. 102–29, with respect to the Maintenance of Way Employees on Conrail.

Following extended hearings for a preliminary injunction and declaratory relief on December 11, 12, and 13, 1991, in Easton, Pennsylvania, the parties agreed, pursuant to Fed.R.Civ.P. 65(a)(2), that the preliminary hearing would be consolidated with the hearing for a final and permanent injunction and declaratory relief. (12/13/91 Tr. at 68, Closings.) Having fully considered the testimony presented at the hearing and the arguments of counsel, we make the following findings of fact and state the following conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

*A. The 1984 § 6 Notices.*

1. On April 2, 1984, the Brotherhood of Maintenance of Way Employees ("BMWE") served, generally, most of the major railroads who were parties to the Railroad Employees National Health & Welfare Plan (the "Health & Welfare Plan"), with notices under § 6 of the Railway Labor Act, 45 U.S.C. § 156. (12/11/91 Tr. at 26–7, Swert Direct; Pl.'s Ex. 4.)

2. Conrail's Maintenance of Way Employees are represented by three union federations—the Pennsylvania Federation, the Consolidated Rail System Federation, the Consolidated Rail System Federation, and the Northeastern System Federation (the "Federations")—which are subdivisions of the BMWE. On April 30, 1984, the Federations served Conrail with § 6 notices which were identical to the April 2, 1984 notice served generally by the BMWE. The Federations' notices requested national multi-employer bargaining ("national handling") and designated the BMWE as the national representative for those Conrail employees represented by the Federations. (12/11/91 Tr. at 29–31, Swert Direct; Pl.'s Ex. 5 and 6.)

3. The railroads then served the BMWE, and other railroad unions, with identical counter-notices. Conrail served its counter-notice on the Federations on May 15, 1984, requesting that the dispute be handled locally. (12/11/91 Tr. at 32, Swert Direct; Pl.'s Ex. 7.)

4. The notices and counter-notices proposed changes in the parties' collective bargaining agreements with respect to wages, work rules, and health care plans, including the Health & Welfare Plan. (12/11/91 Tr. at 26, Swert Direct; Pl.'s Ex. 4, 5, and 7.)

5. On September 24, 1984, the Federations served an additional § 6 notice on Conrail, seeking to rewrite the union's scheduling agreement. This dispute was subject wholly to local bargaining ("local handling") and was never submitted to the National Mediation Board. (12/11/91 Tr. at 102–5, Swert Cross; 12/12/91 Tr. at 139, Dodd Direct; Defs.' Ex. 2.)

6. On February 14, 1985, Conrail and the Federations entered into the so-called "Valentine's Day Agreement," under which Conrail agreed to restore industry standard rates of pay to Conrail employees. Under the terms of that collective bargaining agreement both parties agreed, with certain exceptions, to submit outstanding § 6 notices, including the parties 1984 proposals, to national handling.[1] They agreed further that, in the event that the disputes submitted to national handling were not resolved by a national agreement, unresolved disputes would revert to local handling.[2] (12/11/91 Tr. at 35–9, Swert Direct; 12/11/91 Tr. at 111, 113, Swert Cross;

---

1. Section 2 of the agreement provided: "Conrail and the representatives of its employees will take all steps necessary to pursue resolution of pending Section 6 notices which propose national handling, in such handling, and agree to be bound by agreements resulting from such national handling...." (Pl.'s Ex. 8.)

2. Section 2(b) of the agreement provided: "Section 6 notices proposing changes in work rules or in other working conditions not resolved by the terms of a National Agreement covering a craft or class of employees, ... [would revert to local handling] under Section 5 of the Agreement of May 5, 1981, which implements Section 712 of the 3R Act." (Pl.'s Ex. 8; Defs.' Ex. 15.)

12/12/91 Tr. at 138–9, Dodd Direct; Pl.'s Ex. 8 and 9; Defs.' Ex. 3 and 4.)

7. On December 17, 1985, pursuant to the terms of the Valentine's Day Agreement, Conrail authorized the National Carriers Conference Committee, the railroad carriers' national bargaining representative, to engage in national handling over the parties' 1984 notices. (12/11/91 Tr. at 31 and 34, Swert Direct; 12/12/91 Tr. at 4–5, Hopkins Direct; Pl.'s Ex. 8, attachments A, B, and C.)

8. Notwithstanding the terms of the Valentine's Day Agreement, the parties dispute the legal effect of the agreement. Conrail maintains that, with certain exceptions, Conrail and the Federations agreed to concerted national handling of all outstanding disputes, including the parties' 1984 proposals. The Federations maintain that, although the parties agreed to be bound by a national agreement with respect to certain issues, if such an agreement was ever reached, the parties remained primarily in local handling. (12/11/91 Tr. at 34–8, Swert Direct; 12/12/91 Tr. at 139–141, Dodd Direct; 12/13/91 Tr. at 16–22, Dodd Cross.)

9. The disputes between the National Carriers Conference Committee and the BMWE arising from the 1984 notices were docketed for mediation by the National Mediation Board ("NMB") as NMB Case No. A–11540. Mediation led to a national agreement, dated October 17, 1986, between the National Carriers Conference Committee and the BMWE settling all disputes arising from the parties' 1984 proposals, except for those disputes relating to health and welfare. The agreement provided for a general moratorium, until April 1, 1988, prohibiting additional § 6 notices on any of the issues which were resolved under the terms of the agreement. (12/11/91 Tr. at 40–2, Swert Direct; 12/11/91 Tr. at 94, 115–6, Swert Cross; 12/12/91 Tr. at 5–8, Hopkins, Direct; Pl.'s Ex. 10, Article IX § 2.)

10. The October 17, 1986 Agreement provided for the establishment of a single, joint, Special Committee to consider and make recommendations concerning the health and welfare proposals. If all issues put before the Special Committee were not resolved by June 1, 1987, the neutral chairman of the Special Committee was to make recommendations on unresolved issues by July 1, 1987. The agreement further provided that the 1984 health and welfare proposals would be held in abeyance until the Special Committee procedures were concluded. (Pl.'s Ex. 10, Articles V and IX §§ 2(b) and (d).)

11. The establishment of the Special Committee, pursuant to the October 17, 1986 Agreement, was deferred until all the unions reached similar agreements with the railroads. The last two unions did not ratify their agreements until December 1987. (12/12/91 Tr. at 11–12, Hopkins Direct.)

12. NMB Case No. A–11540 remained open, following the October 17, 1986 Agreement, to the extent necessary for the parties to complete the Special Committee procedures. (12/12/91 Tr. at 8–11; Hopkins Direct; Pl.'s Ex. 33, 34, and 35.)

13. On May 13, 1988, the unions notified the carriers that they would not proceed with the establishment of the Special Committee, pursuant to the October 17, 1986 Agreement. Accordingly, the Special Committee was never established. (12/11/91 Tr. at 115–16, Swert Cross; 12/12/91 Tr. at 14–17, Hopkins Direct; Pl.'s Ex. 37, 38, and 39.)

*B. The 1988 § 6 Notices.*

14. In June, 1988, the BMWE and most of the other unions served the railroads with new notices under § 6 of the Railway Labor Act that contained a number of proposals for changes in the parties' collective bargaining agreements, including additional health and welfare notices. On June 10, 1988, the Federations served Conrail with notices which were identical to the June, 1988 notices served generally by the BMWE. (12/11/91 Tr. at 47, 49–51, Swert Direct; Pl.'s Ex. 12.)

15. On July 27, 1988, Conrail served counter-notices on the Federations. Because Conrail maintained that the carriers' 1984 health and welfare notices were still unresolved, Conrail's 1988 notices did not contain proposals with respect to health

and welfare. (12/11/91 Tr. at 51–3, Swert Direct; 12/12/91 Tr. at 26, Hopkins Direct; Pl.'s Ex. 13.)

16. Most of the railroads, including Conrail, gave their respective national representatives authority to represent them in national multi-employer bargaining with respect to the June 10, 1988 notices served on the railroads by the BMWE. The NMB docketed this dispute for mediation as NMB Case No. A–12252. (12/11/91 Tr. at 52–4; Pl.'s Ex. 14 and 15.)

17. The Federations did not give authority to the national BMWE representatives to represent Conrail's Maintenance Of Way Employees in national handling of their 1988 notices, and on October 28, 1988, the Federations notified Conrail that they were amenable only to local handling of the 1988 notices. The NMB docketed the dispute between Conrail and the Federations arising out of the Federations' June 10, 1988 notices for mediation as NMB Case No. A–12260. (12/11/91 Tr. at 54–56, Swert Direct; 12/12/91 Tr. at 86–89, Hopkins Cross; 12/12/91 Tr. at 144–6, 152–4, Dodd Direct; Pl.'s Ex. 16 and 17; Defs.' Ex. 11.)

18. From the inception of both parties' 1988 notices, Conrail and the Federations disagreed whether the 1988 notices were in local or national handling. On March 30, 1990, frustrated by the pace of negotiations over the 1988 proposals, the Federations threatened a strike claiming that Conrail was not bargaining in good faith. (12/11/91 Tr. at 57, Swert Direct.)

19. On April 4, 1990, this Court enjoined the threatened strike on the grounds that the 1988 proposals presented a major dispute in which the applicable procedures under the Railway Labor Act had not been exhausted, and that the threatened strike was therefore unlawful and subject to injunction. The court also found Conrail to be bargaining in good faith. *Consolidated Rail Corp. v. BMWE,* 735 F.Supp. 1265 (E.D.Pa.1990).

20. On May 4, 1990, the Federations filed an action in the United States District Court for the Northern District of Ohio, seeking declaratory and injunctive relief ordering Conrail to engage in local handling with the Federations concerning the Federations' 1988 notices and Conrail's 1988 counter-notices.[3] Complaint for Declaratory and Injunctive Relief, *Lodge 1657, BMWE v. Consolidated Rail Corporation,* Civil Action No. 90–0817 (N.D.Ohio) (White, J.). On September 7, 1990, the case was transferred to the United States District Court for the Eastern District of Pennsylvania and assigned Civil Action No. 90–5820.

21. On September 21, 1990, the parties reached a settlement in the *Lodge 1657* case. Conrail agreed that the parties' 1988 proposals would be resolved in local handling under the auspices of NMB Case No. A–12260.[4] This Court then dismissed the action as settled with prejudice pursuant to Local Rule of Civil Procedure 23(b). (12/11/91 Tr. at 63–67, Swert Direct; Pl.'s

---

**3.** The Complaint, filed in Ohio, prayed for an injunction prohibiting Conrail, "its officers, agents, employees, attorneys and representatives from its continued willful violation of the Railway Labor Act and from interfering in any way whatsoever, with the designation of the plaintiffs Consolidated Rail Federation, Pennsylvania Federation and Northeastern Federation as the bargaining representatives of its maintenance of way employees relative to their Section 6 notices served on June 10, 1988 and the defendant's Section 6 notices in response thereto including the submission of any application to any administrative or judicial tribunal seeking the inclusion of the plaintiffs in national handling or multicarrier bargaining, and issue its mandate requiring defendant to bargain with the designated representative of the aforesaid plaintiff system federations...." Plaintiff's Complaint at 8.

**4.** The actual terms of the settlement agreement were written in a letter as follows: "[W]e [Conrail] will agree that the Conrail–BMWE dispute will be resolved in local handling under the auspices of the NMB in Case No. A–12260." (Plaint. Ex. 18.) None of the documents or testimony from the *Lodge 1657* case ever mentioned the 1984 health and welfare proposals or NMB Case No. A–11540. Neither of the parties ever discussed the 1984 health and welfare notices with the 1988 notices until October, 1990, after the settlement. (12/11/91 Tr. at 127, Swert Cross.) Notwithstanding this fact, the Federations argue that under the terms of the settlement agreement, "the Conrail–BMWE dispute" included the 1984 health and welfare proposals from NMB Case No. A–11540.

Ex. 18 and 19; Order Dismissing Civil Action No. 90–5820, September 24, 1990 (Van Antwerpen, J.))

22. The Conrail–Federation dispute over the Federations' June 10, 1988 notices remains in mediation to this day.

## C. Presidential Emergency Board 219.

23. During the 1988 round of negotiations the National Carriers Conference Committee and the labor organizations, including the BMWE, agreed to resolve all outstanding health and welfare issues, namely the carriers' 1984 health and welfare notices, docketed under NMB Case No. A–11540, and the unions' 1988 health and welfare proposals, docketed under NMB Case No. A–12252, before considering the parties' 1988 wage proposals. (12/12/91 Tr. at 19–24, Hopkins Direct; 12/12/91 Tr. at 61–64, Hopkins Cross.)

24. The BMWE only agreed to resume negotiations over the carriers' 1984 health and welfare notices without prejudice to the position of some unions, including the Federations, that the carriers' 1984 health and welfare notices had expired. (Pl.'s Ex. 41 attachment 6, September 19, 1988 Hopkins—BMWE Ltr.)

25. Mediation over the health and welfare issue progressed under the auspices of NMB Case Nos. A–11540 and A–12252, among others. (12/12/91 Tr. at 28, 30, Hopkins Direct; 12/12/91 Tr. at 91–7, Hopkins Cross; 12/13/91 Tr. at 6, Dodd Direct; Pl.'s Ex. 44 and 45.)

26. On March 6, 1990, the railroads and the unions, including Conrail and the BMWE, entered into the so-called "Seven Point Agreement" governing the establishment of a Presidential Emergency Board to make recommendations on, *inter alia*, health and welfare. Pursuant to that agreement, the NMB informed the unions, including the BMWE, that it could not bring the parties to agreement in certain enumerated disputes, including NMB Cases No. A–11540 and No. A–12252, which contained the 1984 and 1988 health and wel-

fare issues, and proffered arbitration in accordance with § 5, First of the Railway Labor Act. On April 5, 1990, the NMB released the parties from mediation pursuant to § 5, First (b) of the Railway Labor Act. (12/11/91 Tr. at 120–23, Swert Cross; 12/12/91 Tr. at 31–34, Hopkins Direct; Defs.' Ex. 5.)

27. On April 3, 1990, the BMWE informed Conrail that the Seven Point Agreement had no application to Conrail insofar as the Federations were concerned. The BMWE reminded Conrail that while NMB Case No. A–12252, which contained the 1988 health and welfare issues between Conrail and the BMWE, was in national handling and subject to the expedited presidential emergency board procedures as a result of the settlement, NMB Case No. A–12260, between Conrail and the Federations, remained in local handling. No references were made to NMB Case No. A–11540, which contained the 1984 health and welfare issues. (12/12/91 Tr. at 162, Dodd Direct; 12/13/91 Tr. at 9–11, Dodd Direct; Defs.' Ex. 8.)

28. On May 3, 1990, President Bush appointed Presidential Emergency Board 219. (12/12/91 Tr. at 35, Hopkins Direct.)

29. On January 15, 1991, Presidential Emergency Board 219 made its Report to President Bush. The Presidential Emergency Board recommended wage increases for the employees, certain modifications of work rules, and substantial changes to the Health & Welfare Plan. These recommendations addressed a number of disputes including those docketed as NMB Case Nos. A–11540 and A–12252.[5] (12/12/91 Tr. at 36–48, Hopkins Direct; Pl.'s Ex. 47 at 7–8, 53–61.)

30. Presidential Emergency Board 219 recommended "a moratorium period for all matters on which notices might properly have been served when the last moratorium ended" on July 1, 1988 "to be in effect through January 1, 1995." New demands under § 6 of the Railway Labor Act could "be served by any of the parties on another

5. Certain carriers, although parties to the October 17, 1986 Agreement, withdrew their 1984 notices on health and welfare and the unions' 1988 notices on health and welfare from national handling in 1988. Accordingly, these carriers and unions were not party to Presidential Emergency Board 219. Conrail was not one of these carriers. (12/12/91 Tr. at 82–5, Hopkins Cross; 12/12/91 Tr. at 120, Hopkins ReDirect; 12/12/91 Tr. at 128–133, Hopkins ReCross.)

party no earlier than November 1, 1994." (Pl.'s Ex. 47 at 93.)

31. The railroads and unions under the jurisdiction of Presidential Emergency Board 219 agreed to requests by the NMB to extend the 30–day "status quo" requirement of § 10 of the Railway Labor Act to April 17, 1991. During that period, three national railroad unions settled their disputes with the railroads on the basis of the Presidential Emergency Board Recommendations, but the BMWE and certain other unions did not. (12/12/91 Tr. at 39, Hopkins Direct.)

32. On April 17, 1991, the non-settling unions struck the railroads. Congress acted to end the strikes that same day. It enacted Pub.L. No. 102–29, stating in the Preamble that "it is essential to the national interest, including the national health and defense, that essential transportation services be maintained." President Bush promptly signed the emergency legislation, which became effective immediately. (Pub.L. No. 102–29; 12/12/91 Tr. at 39–40, Hopkins Direct.)

33. Pub.L. No. 102–29 settled the national disputes by imposing the Recommendations of Presidential Emergency Board 219 on the parties "as though arrived at by agreement of the parties under the Railway Labor Act." Pub.L. No. 102–29 §§ 1(3), 3(e). Apart from the recommended changes, Pub.L. No. 102–29 required the parties to restore the status quo that existed before 12:01 a.m. on April 17, 1991. *Id.* § 1(1). The strikes accordingly ended.

34. A Special Board was established and empowered to clarify Presidential Emergency Board 219's Recommendations and to modify them if any were "demonstrably inequitable" or based on "material error" or "material misunderstanding." Pub.L. No. 102–29 § 3(d). Pub.L. No. 102–29 precludes judicial review of Presidential Emergency Board 219's Recommendations, as clarified or modified by the Special Board. *Id.* § 3(g).

35. The Special Board issued certain clarifications on June 11, 1991, none of which pertained to the Recommendations of Presidential Emergency Board 219 regarding health and welfare. On July 18, 1991, the Special Board issued additional clarifications on certain issues pertaining only to the Southern Pacific Railroad. Among these clarifications, the Special Board ruled that the moratorium provision of Presidential Emergency Board 219 was meant to be "all inclusive" and that "all matters involving subjects which were referred to in notices served during the present round of negotiations are barred until January 1, 1995." (Pl.'s Ex. 49 at 13; Pl.'s Ex. 50.)

36. On October 16, 1991, in response to a joint request of the BMWE and the National Carriers Conference Committee, the Special Board ruled that "[t]he purpose of [Presidential Emergency Board 219 was] ... to settle disputes growing out of the notices served upon the carriers ... by the Brotherhood of Maintenance of Way Employees ("BMWE") dated on or about March 15, 1984 and May 25, 1988 and proposals served on or about March 20, 1984 and March 8, 1989 by the carriers for concurrent handling therewith."[6] (Defs.' Ex. 1 at 6.)

### D. The Federations' Threatened Strike.

37. On September 1, 1991, Conrail implemented, with respect to its Maintenance of Way Employees, the first change required by Presidential Emergency Board 219 by substituting a wholly self-insured administrative services only plan ("ASO plan") for the existing plan. This change merely effected how Conrail would finance the plan and had no direct effect on plan beneficiaries, *i.e.* employees benefits remained unchanged. (12/11/91 Tr. at 161-2, Brennan Direct.)

38. Since implementing an ASO plan, Conrail's monthly contribution to the plan

---

**6.** There was testimony to the effect that in moratorium clauses, the subject matter which is to be barred is designated by referring to the approximate dates on which a round of bargaining began. No date listed in a moratorium clause can be considered to be exact because carriers and unions do not always serve their respective § 6 notices on the same date. (12/12/91 Tr. at 49–52, Hopkins Direct; 12/12/91 Tr. at 65–75, Hopkins Cross.)

has decreased by $6.92 per employee per month. If the plan remains an ASO plan in 1992, it is estimated that Conrail's monthly contribution will be decreased by an additional $.58 per employee per month, representing an annual savings to Conrail of $280,000. (12/11/91 Tr. at 77–82, Swert Direct.)

39. Conrail plans to implement, with respect to its Maintenance of Way Employees, other changes in the Health & Welfare Plan as provided by Presidential Emergency Board 219, on January 1, 1992. Those changes are:

(a) The Plan will be converted into a comprehensive medical expense plan that generally pays 85% of all covered expenses, after a deductible of $100 per individual or $300 per family, until the employee's out-of-pocket cost for covered expenses reaches $1,500 per individual or $3,000 per family, at which point the Plan will generally pay 100% of all covered expenses. Currently, the Plan is a basic benefits/major medical plan that pays 100% of basic hospital expenses, of the first $2,500 of ancillary hospital expenses, and of the fees for various other services up to specified dollar amounts that are usually far less than the charges levied by the service providers; in addition, the Plan generally pays 80% of all other covered expenses, after a $100 deductible per individual, until the employee's out-of-pocket cost for covered expenses reaches $2,000 per individual. The Plan does not now provide for either a family deductible or a family out-of-pocket maximum.

(b) Where a person covered by the Plan is also covered by the plan of another employer, the Plan will be changed to pay benefits in such an amount that the total benefits paid by both plans together will be no greater than the benefits that would have been paid had the person involved been covered only by the more generous of the two plans. Currently, in such situations the Plan pays benefits in such an amount that the total benefits paid under the two plans together may be as high as 100% of the covered expenses involved. The current arrange-

ment will remain in effect where a husband and wife are both covered as employees by the Plan.

(c) New benefits for mammograms, childhood disease immunizations, pap smears and colorectal cancer screening will be added to the Plan; in addition, the Plan will pay for the services of a psychologist if those services would have been covered under the Plan were they provided by a physician.

(d) The Plan will no longer pay Medicare Part B premiums for employees who receive no benefits through Medicare Part B that they do not already have under the Plan.

(12/11/91 Tr. at 77–8, Swert Direct; 12/11/91 Tr. at 160–70, Brennan Direct.)

40. If Conrail were not able to implement the additional changes that are intended to go into effect on January 1, 1992, it is estimated that it would cost Conrail approximately $650,000 on an annualized basis. (12/11/91 Tr. at 84, Swert Direct.)

41. On October 21, 1991, the Federations sent their members a "Strike Vote Notification." This notification requested authorization to strike Conrail if Conrail implemented the changes to the Health & Welfare Plan called for by Presidential Emergency Board 219. The notification further alleged that "the law requires Conrail to maintain the same level of [health] benefits that existed in June 1988. If Conrail wants to prevent this strike, it must make arrangements to insure that these benefits are continued unchanged." (Pl.'s Ex. 31.)

42. In a press release issued on November 19, 1991, the Federations stated that a strike by the BMWE at Conrail could take place at any time after completion of the voting called for by the Strike Vote Notification. (Pl.'s Ex. 32.)

43. The Federations have virtually one hundred percent approval from all lodges to support a strike. While the Federations must obtain approval from the Joint Protective Boards, the Grand Lodge, and the President of the BMWE before striking, the Federations claim such approval will be

forthcoming and intend to strike on or about January 1, 1992, the date on which Conrail plans to implement the remaining recommendations of Presidential Emergency Board 219. (12/13/91 Tr. at 61–3, 66, Dodd Cross.)

44. Conrail operates on a system-wide basis in 15 states, the District of Columbia, and one province in Canada, with approximately 26,000 employees. Approximately 22,500 of these employees are covered by collective bargaining agreements. (12/11/91 Tr. at 17–18, Hatton Direct; Pl.'s Ex. 3 ¶ 2; 12/11/91 Tr. at 23–24, Swert Direct.)

45. The Federations represent approximately 3,100 members who work on Conrail. These employees keep the Conrail rights of way, bridges and some buildings in good repair. (12/11/91 Tr. at 24, Swert Direct.)

46. In the event of a strike by the Brotherhood of Maintenance of Way Employees, it is highly unlikely that Conrail's other organized employees would cross the picket lines. (12/11/91 Tr. at 24, Swert Direct.)

47. Conrail is heavily engaged in the transportation of food stuffs, produce, fuel, supplies, hazardous materials and other commodities essential to the health and welfare of the inhabitants of the northeastern and midwestern United States including, but not limited to, all of those states in which Conrail currently operates. (12/11/91 Tr. at 17–18, Hatton Direct; Pl.'s Ex. 3 ¶ 3.)

48. Conrail transports automobile parts from western points through Pittsburgh to Ford, General Motors and Chrysler assembly plants located in Metuchen, New Jersey; Linden, New Jersey; and Newark, Delaware. Because these companies operate on a demand delivery basis, with no inventory stockpiling, any curtailment in the delivery of auto parts to these locations will result in the immediate closure of these plants and the layoffs of thousands of employees. (12/11/91 Tr. at 17–18, Hatton Direct; Pl.'s Ex. 3 ¶ 6.)

49. Conrail transports energy supplies such as coal to a variety of public utilities throughout the Conrail system, is one of the major carriers of the United States Mail, and also carries military supplies of the United States Government. (12/11/91 Tr. at 17–18, Hatton Direct; Pl.'s Ex. 3 ¶¶ 7, 8.)

50. Because of the "flow-through" nature of the Conrail system, any work stoppage, slowdown or job action by the Federations will prevent freight traffic from moving between cities and into and out of existing freight yards thereby seriously disrupting Conrail's ability to deliver or to receive shipments from its customers. In addition, because Amtrak, Septa and other commuter authorities operate over portions of Conrail's system, there is a likelihood that passenger operations will also be disrupted. (12/11/91 Tr. at 17–18, Hatton Direct; Pl.'s Ex. 3 ¶ 5.)

51. If picketing, work stoppages or slowdown commence or continue, Conrail will be unable to maintain continuity of service, will lose substantial revenue and business to competing forms of transportation, and many of the employees of Conrail who are not represented by the defendant unions will be forced out of work and be without a means of livelihood. Because Conrail is in a highly competitive business and therefore must compete actively with a large number of other transportation companies such as airlines and trucking companies, any disruption in Conrail's services could in time result in the permanent loss of customers' good will and future business upon which Conrail relies for its livelihood. (12/11/91 Tr. at 17–18, Hatton Direct; Pl.'s Ex. 3, ¶¶ 11, 12.)

52. Approximately 50% of the traffic which moves over Conrail also moves over one or more other railroads as well. Conrail estimates that a shutdown of its system would snowball and have the potential for other railroads losing 1,700,000 carloads of traffic annually, at a loss of more than $150,000,000 in monthly revenue. (12/11/91 Tr. at 17–18, Hatton Direct; Pl.'s Ex. 3 ¶ 13.)

## DISCUSSION

■ In order to obtain a permanent injunction against Defendants' threatened

strike in this case, Plaintiff must show that the strike would be unlawful under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* Plaintiff may demonstrate this by showing that Defendants have failed to follow the procedures mandated by the Railway Labor Act for the type of dispute that is causing the strike threat. Accordingly, we must first determine whether the labor dispute between the parties is a major one or a minor one, as defined by the Railway Labor Act.

If we find that the dispute is a major one, then the Railway Labor Act requires both parties to the dispute to maintain the status quo and we must not only enjoin the proposed strike, but also order Conrail to refrain from implementing the recommendations of Presidential Emergency Board 219. *Consolidated Rail Corp. v. Railway Labor Executives' Assn.,* 491 U.S. 299, 302–303, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989) (hereinafter *Conrail v. R.L.E.A.*); *United Transp. Union v. Penn Central Transp. Co.,* 505 F.2d 542, 543 (3d Cir.1974); *Consolidated Rail Corp. v. Brotherhood of Maintenance of Way Employees,* 735 F.Supp. 1265, 1271 (E.D.Pa. 1990) (hereinafter *Conrail I*). The parties then must submit their dispute to the National Mediation Board, and if dissatisfied with the results obtained there, proceed with more remedies outlined in the Railway Labor Act. Only after all major dispute proceedings have been exhausted may either party resort to self help.

If we find that the parties are engaged in a minor dispute, however, we must enjoin Defendants from striking and require all parties to follow the formal grievance process provided in 45 U.S.C. § 153, culminating in compulsory and binding arbitration by the National Railroad Adjustment Board. *Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, *reh. denied* 353 U.S. 948, 77 S.Ct. 823, 1 L.Ed.2d 857 (1957); *REA Express, Inc. v. BRAC,* 459 F.2d 226 (5th Cir.), *cert. denied,* 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972);

*Conrail I,* 735 F.Supp. at 1271. Under minor dispute procedures Conrail would be free to implement the recommendations of Presidential Emergency Board 219 while they await a decision from the Adjustment Board. *Consolidated Rail Corp. v. Railway Labor Executives' Assn.,* 491 U.S. at 304, 109 S.Ct. at 2481; *General Committee of Adjustment, United Transp. Union, Western Maryland Ry. Co. v. CSX R.R. Corp.,* 893 F.2d 584, 590 (3d Cir.1990) (hereinafter *"General Committee v. CSX"*).

While the United States Supreme Court has not recognized a general statutory obligation on the part of a carrier to maintain the status quo pending a decision of the National Railroad Adjustment Board, district courts do have the discretion in some situations to condition the granting of a strike injunction pending resolution to a dispute before the National Railroad Adjustment Board. *Conrail v. R.L.E.A.,* 491 U.S. at 303, 109 S.Ct. at 2481. Such conditions are appropriate where they are necessary to preserve the jurisdiction of the National Railroad Adjustment Board and to prevent irreparable injury to the union. *Brotherhood of Locomotive Engineers v. Missouri K.T.R. Co.,* 363 U.S. 528, 534–5, 80 S.Ct. 1326, 1330–4, 4 L.Ed.2d 1379 (1960); *Division 1, Detroit, Brotherhood of Locomotive Engineers v. Consolidated Rail Corporation,* 844 F.2d 1218, 1221 n. 2 (6th Cir.1988).

Under neither scenario is it within the power of this Court to finally resolve the underlying dispute, and under both scenarios there can be no strike at the present time.[7] Our role is simply to decide which scheme of procedures the parties must adhere to, and whether Conrail will be permitted to implement their proposed changes in the Health & Welfare Plan while the parties pursue further procedures in another forum.

The distinction between major and minor disputes has been characterized as follows:

7. We note that the Federations would have a right to strike Conrail if the dispute were a major one and they had fully exhausted the statutorily-required procedures. As we explain below, that is not the case here.

Under the [Railway Labor Act], a major dispute is one arising out of the formation or change of collective agreements covering rates of pay, rules, or working conditions. *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 722–727, 65 S.Ct. 1282 [1289–92] [89 L.Ed. 1886] (1945). A minor dispute involves the interpretation or application of a collective agreement and under § 3 of the [Railway Labor Act] is subject to binding interpretation by the Railway Adjustment Board. *Elgin, J. & E.R. Co. v. Burley, supra* at 722–727, 65 S.Ct. 1282 [1289–92].

*United Transp. Union v. Penn Central Transp. Co.,* 505 F.2d at 543. In sum, "major disputes seek to create contractual rights, minor disputes to enforce them." *Conrail v. R.L.E.A.,* 491 U.S. at 302, 109 S.Ct. at 2480. Major disputes look to the acquisition of rights for the future, minor disputes to the assertion of rights claimed to have vested in the past. *Id.,* citing *Elgin, J. & E. R. Co. v. Burley,* 325 U.S. at 723, 65 S.Ct. at 1289–1290.

 If an employer asserts a claim that the agreements between it and the unions give it the power to make certain changes in working conditions, and if the claim is arguably justified by the terms of those agreements, *i.e.,* the claim is not obviously insubstantial, frivolous, or made in bad faith, then the courts must defer to the exclusive jurisdiction of the National Railroad Adjustment Board. *Conrail v. R.L.E.A.,* 491 U.S. at 310, 109 S.Ct. at 2484. In other words, a dispute is minor if it is arguable that the existing agreements between the parties, when interpreted and applied within the context of their past practices, can conclusively resolve the dispute. *General Committee v. CSX,* 893 F.2d at 586. The burden of showing this arguable justification is a light one, and in close cases the dispute is characterized as minor. *Conrail v. R.L.E.A.,* 491 U.S. at 320, 109 S.Ct. at 2489; *General Committee v. CSX,* 893 F.2d at 591.

All parties to the instant lawsuit agree that if the Federations were engaged in national bargaining with respect to the carriers' 1984 § 6 notices at the time when Congress enacted Pub.L. No. 102–29, the Federations are bound by the recommendations of Presidential Emergency Board 219 and Conrail is free to implement the changes it proposes. The dispute between the parties is over whether the unions ever entered national bargaining and, if so, whether they effectively withdrew from national bargaining before the enactment of Pub.L. No. 102–29.

Conrail argues, that under the terms of the 1985 Valentine's Day Agreement, the 1984 health and welfare notices were submitted to national handling and later docketed before the NMB as Case No. A–11540. Under the terms of the October 17, 1986 Agreement, NMB Case No. A–11540 remained open pending resolution of Special Committee procedures. Since the parties failed to reach an agreement under those procedures, the 1984 health and welfare proposals were subject to processing under the major dispute procedures of the Railway Labor Act. Pursuant to those procedures, the 1984 health and welfare disputes, including NMB Case No. A–11540, were submitted to Presidential Emergency Board 219, and on April 17, 1991, Congress enacted Pub.L. No. 102–29, imposing the recommendations of Presidential Emergency Board 219 on the parties as an agreement under the Railway Labor Act.

 It is clear that once a party enters national handling, it cannot withdraw without the express consent of all other parties to the bargaining prior to exhausting the major dispute procedures of the Railway Labor Act. *United Transp. Union v. Grand Trunk Western R. Co.,* 901 F.2d 489, 490 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 55, 112 L.Ed.2d 31 (1990); *American Ry. and Airway Sup'rs Ass'n (Div. of BRAC) v. Soo Line R. Co.,* 891 F.2d 675, 678 (8th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 42, 112 L.Ed.2d 19 (1990). Conrail maintains that it never consented to the withdrawal of the 1984 notices from national handling, and so they were still in national handling when Congress imposed the recommendations of Presidential Emergency Board 219 on all

who were at that time in national handling.[8]

Taking issue with Conrail's interpretations of the 1985 Valentine's Day Agreement and the October 17, 1986 Agreement, the Federations argue that the carriers' 1984 health and welfare proposals either expired under the terms of the October 17, 1986 Agreement or that the carrier's 1984 health and welfare proposals reverted to local handling under the terms of the October 17, 1986 Agreement. Under the terms of the October 17, 1986 Agreement, the health and welfare proposals remained unresolved pending certain Special Committee procedures which never occurred. Since the October 17, 1986 Agreement made no allowances for resolution of the health and welfare issue in the event that the Special Committee procedures failed, the Federations argue that the 1984 notices either expired under the terms of that agreement's general moratorium on April 1, 1988 or reverted to local handling under the terms of the 1985 Valentine's Day Agreement because the parties failed to reach a national agreement over health and welfare. Thus, the Defendant Federations claim they were never a party to the "agreement" enacted into law by Congress on April 17, 1991, and, in their view, the current dispute between Conrail and the Federations over implementation of the proposed health plan changes is a major dispute over the creation of a new contract—the Congressionally mandated agreement encompassing the recommendations of Presidential Emergency Board 219.

This reasoning mistakes the true nature of the dispute which brings the parties before this Court. The issue to which both parties devoted the majority of their arguments, both in their briefs and at oral argument, is the correct interpretation of the 1985 Valentine's Day collective bargaining agreement and the October 17, 1986 collective bargaining agreement—whether those agreements put the carriers' 1984 health and welfare notices into national handling. The interpretation and application of any type of collective bargaining agreement is a classical minor dispute, subject to mandatory arbitration before the National Railroad Adjustment Board. The ultimate result of contract interpretation—the decision as to whether or not the Federations are party to the Presidential Emergency Board 219 and Pub.L. No. 102–29—will not mislead us into believing that the dispute here is over the acquisition of new contract rights.

It is not our place to determine what happened to the carriers' 1984 health and welfare proposals under the terms of the 1985 Valentine's Day Agreement and the October 17, 1986 Agreement. Congress has wisely placed that duty in the hands of others who are skilled in the labor problems of railroads. Our task is merely to determine if Conrail has met its light burden in establishing that it is arguably justified in reading those agreements to say that the 1984 health and welfare issues not resolved by the Special Committee Procedures were subject to progressing under the Railway Labor Act, and as such, whether Conrail is arguably justified in implementing the changes called for by Presidential Emergency Board 219, with respect to Conrail's Maintenance of Way Employees.

Based on the testimony we heard, there are sufficient facts for any reasonable trier of fact to find that: Conrail and the Federations agreed to submit most 1984 proposals, including health and welfare, to national handling under the terms of the 1985 Agreement; this dispute was submitted to the NMB for mediation under NMB Case No. A–11540; mediation resulted in a national agreement, dated October 17, 1986, on all issues except for health and welfare; NMB Case No. A–11540 remained open pending resolution of the health and wel-

---

**8.** The Federations maintain that, under the terms of the September 1990 settlement agreement, the parties agreed to resolve all health and welfare issues in local handling under the auspices of NMB Case No. A–12260. We find no facts to support this contention. Nothing in the papers or the testimony of the *Lodge 1657* case mentioned anything more than the Federations' 1988 notices and NMB Case No. A–12260. Nowhere was there any mention of the carriers' 1984 health and welfare notices or of NMB Case No. A–11540.

fare issue under the Special Committee procedures; on September 21, 1991 Conrail and the Federations agreed that the Federations' 1988 notices would be handled locally under the auspices of NMB Case No. A–12260, despite the fact that the carrier's 1984 health and welfare notices were still open and subject to national handling concurrently with most of the union's 1988 health and welfare notices under the auspices of NMB Case Nos. A–11540 and A–12252, among others; on March 6, 1990, the railroads and unions, including Conrail and the BMWE, agreed to submit the health and welfare proposals to Presidential Emergency Board 219; on April 17, 1991, Congress enacted Pub.L. No. 102–29, imposing the recommendations of Presidential Emergency Board 219 on the parties, as if it was an agreement under the Railway Labor Act; and that the Federations never withdrew from NMB Case No. A–11540 prior to the enactment of Pub.L. No. 102–29.

■ Since a party cannot unilaterally withdraw from national handling until all major dispute procedures are exhausted, we cannot help but find that Conrail is arguably justified in reading the 1985 Valentine's Day Agreement as placing the parties into national handling, the 1986 Agreement as leaving the unresolved 1984 health and welfare issues in national handling, which were not ultimately resolved until the enactment of Pub.L. No. 102–29, and the October 17, 1985 Agreement as binding the parties to the terms of Pub.L. No. 102–29, a national agreement. Accordingly, we find that Conrail is arguably permitted to implement the recommended changes to the Health & Welfare Plan, with respect to the Maintenance of Way Employees on Conrail. Therefore, the dispute is a minor one.

■ As we noted above, courts may enjoin threatened strikes arising out of minor disputes to protect the National Railroad Adjustment Board's exclusive jurisdiction. This exception to the normal Norris-LaGuardia Act rule against enjoining strikes in labor disputes is justified because a "strike in this situation would make the minor dispute resolution procedures under the Railway Labor Act ineffective and frustrate the statute's purpose of avoiding strikes and instead resolving minor disputes through binding arbitration." *General Committee v. CSX*, 893 F.2d at 595. However, before exercising our authority and issuing an injunction, the court must find both that irreparable injury will occur without the injunction and that Plaintiffs have no adequate remedy at law, and the court must balance the competing claims of injury and the public interest. *Public Interest Research Group, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 82 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.*, 906 F.2d 934, 941 (3d Cir.1990).

■ With regard to the first two points, both Conrail and the Federations stipulated, on facts identical to those before us today, that if there is a strike, Conrail will lose revenue which cannot be recovered and will suffer irreparable harm. *Conrail I*, 735 F.Supp. at 1272. We see no reason, based on the testimony presented in this case, to alter our original finding.

With regard to the third point, Conrail operates rail lines in 15 states, the District of Columbia and one province of Canada. It is the largest rail freight carrier in its territory. In some states, notably Delaware, Pennsylvania, New Jersey, and New York, it is by far the largest rail freight carrier. Many shippers are served only by Conrail. Because of the interconnected nature of the railroad business, any stoppage on Conrail inevitably affects other carriers', including Amtrak and the commuter rail operators. The effect on the public welfare is so great, and so obvious, that it needs no further elaboration.

In implementing the proposed health plan changes, Plaintiffs merely seek to enforce contract rights which they claim were established by the chain of agreements and events culminating in Public Law 102–29. Their contractual arguments are arguably justified, and not obviously insubstantial, so we will leave the resolution of the merits

of their claims to the Adjustment Board. Accordingly, we grant Plaintiff's motion for a strike injunction and allow the parties to proceed with the National Railroad Adjustment Board for compulsory and binding arbitration.

In our discretion, we deny the Defendants' motion of an injunction and declaratory relief preventing Conrail from continuing to implement changes to the Health & Welfare Plan, as mandated by Congress, with respect to the Maintenance of Way Employees on Conrail. While we are sympathetic to the unions' problems and mindful of that some of the Defendants' members and their dependents may be better off under the existing health plan and unhappy about the new plan, we cannot say by any stretch of the imagination that the Health & Welfare plan will cause such irreparable injury to the union that we must enjoin its implementation to preserve the jurisdiction of the National Railroad Adjustment Board. *Missouri K.T.R.*, 363 U.S. at 534–5, 80 S.Ct. at 1330–4; *Division 1, Detroit*, 844 F.2d at 1221 n. 2; *Conrail v. R.L.E.A.*, 491 U.S. at 303, 109 S.Ct. at 2481. Congress found the recommendations of Presidential Emergency Board 219 to be a fair and just resolution of the enormous and overwhelming health care problems facing our nation's railroads, its employees, and its dependents. Moreover, in the event that the National Railroad Adjustment Board should find in favor of the Federations', the Board has broad powers to reimburse employees and make them whole monetarily. Accordingly, we decline to condition our strike injunction and deny Defendants' motion for an injunction and declaratory relief.

## CONCLUSIONS OF LAW

1. Plaintiff Consolidated Rail Corporation and the Defendant Federations are parties to collective bargaining agreements dated February 14, 1985 and October 17, 1986.

2. Conrail and the Federations are engaged in a minor dispute under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, whereby both parties disagree over the interpretation and application of the February 14, 1985 and the October 17, 1986 Agreements.

3. Conrail is arguably justified, under the Railway Labor Act, in implementing changes to the Health & Welfare Plan, consistent with the recommendations of Presidential Emergency Board 219 and Pub.L. No. 102–29, with respect to the Maintenance of Way Employees on Conrail.

4. The Federations have threatened to engage in an unlawful strike under the Railway Labor Act if Conrail continues to implement changes to the Health & Welfare Plan, with respect to the Maintenance of Way Employees on Conrail.

5. The Federations' threatened strike is likely to occur unless restrained by this court.

6. If the Federations' threatened strike occurs, Conrail will suffer substantial and irreparable injury, as a result of the threatened strike and work stoppage by the Federations.

7. Conrail has no adequate remedy at law.

8. If this strike injunction is granted, the injury, if any, to the Federations would be adequately indemnified by the Adjustment Board.

9. As to each item of relief granted to Conrail herein, greater injury will be inflicted upon Conrail by the denial of such relief than will be inflicted upon the Federations by the granting of such relief.

## CONCLUSION

For the reasons above, we grant Plaintiff's motion for a strike injunction, and we deny Defendants' cross-motion for an injunction and declaratory relief preventing Conrail from continuing to implement the congressionally mandated recommendations of Presidential Emergency Board 219. Congress has provided a vehicle to fully address the parties' disputes in the Railway Labor Act—and it is there that the parties must proceed.[9]

An appropriate order follows.

---

9. Our decision in the present case is not meant to minimize in any way the force of Defendants' arguments that they will present to the National Railroad Adjustment Board, and we make no

## ORDER

AND NOW, this 23rd day of December, 1991, upon consideration of the Motion for Preliminary Injunction and after hearing testimony in open court, it is hereby ORDERED that defendant Brotherhood of Maintenance of Way Employees, the defendant Pennsylvania Federation, the defendant Consolidated Rail System Federation, the defendant Northeastern System Federation ("BMWE Union and Federations"), the individual Defendants, individually and collectively, the members of defendant BMWE Union and Federations, their officers, agents, servants, representatives and employees, individually and collectively, and all other persons acting in concert with them or otherwise participating in their aid or behalf are ENJOINED from doing the following acts, or any one of them:

1. from calling, instigating, authorizing, encouraging, participating in, approving of or continuing any picketing (other than informational picketing), patrolling, strike, work stoppage, "sick-out" or slowdown, (a) against Plaintiff Consolidated Rail Corporation ("Conrail"), or (b) affecting Conrail's operations and all acts in furtherance or in support thereof;

2. from picketing (other than informational picketing) or patrolling the premises on which Conrail conducts its operations, including the entrances and any other places where said premises are situated;

3. from interfering with ingress to and egress from said premises by Conrail's employees and other persons having business with Conrail, including the delivery, unloading, dispatch and movement of rolling stock and equipment and the contents thereof;

4. from loitering or congregating at or near any approaches to said premises and upon any public street or highway leading to and from any place with the employees of Conrail or those having business with Conrail desire to enter or leave enroute to or from said premises;

IT IS FURTHER ORDERED AND DECREED:

1. that the BMWE Union, Federations and said other persons are directed to take all steps within their power to prevent said picketing (other than informational picketing), patrolling, strike, work stoppage, "sick-out" or slowdown from occurring or from continuing if commenced;

2. that the BMWE Union and Federations are directed to communicate or cause to be communicated forthwith, to all members of said BMWE Union and Federations who are employed by Conrail, by means reasonably calculated to ensure receipt thereof, the fact that an Order has been issued by this court and the contents of that Order;

3. that the BMWE Union and Federations are directed to instruct members of said BMWE Union and Federations who are employed by Conrail not to engage in any threatened picketing (other than informational picketing), patrolling, strike, work stoppage, "sick-out" or slowdown against Conrail;

4. that the United States Marshal shall enforce this Order;

5. that any violators of this Order shall be brought immediately before this court;

6. that this Injunction shall continue in full force and effect until further Order of this Court; and

7. that defendant BMWE Union and Federations' counter-claim is hereby DISMISSED WITH PREJUDICE, consistent with the foregoing Decision.

conclusions about who should prevail on the merits. We simply hold that Conrail has met the light burden of showing that their interpretation of the agreements at issue is arguably justified. *See Conrail v. R.L.E.A.,* 491 U.S. at 320, 109 S.Ct. at 2489.