CONSOLIDATED RAIL CORPORATION,
Plaintiff,

v.

BROTHERHOOD OF MAINTENANCE
OF WAY EMPLOYEES, et al.,
Defendants.

Civ. A. No. 93–4772.

United States District Court,
E.D. Pennsylvania.

March 28, 1994.

Dennis A. Arouca, Susan K. Lessack, John B. Rossi, Jr., and Nanci A. Hoover, Philadelphia, PA, for plaintiff.

John O'B. Clarke, Jr., Donald F. Griffin, Washington, DC, William W. Bon, Southfield, MI, and Louis Agre, Philadelphia, PA, for defendants.

### DECISION AND ORDER

VAN ANTWERPEN, District Judge.

In this action for injunctive and declaratory relief, plaintiff Consolidated Rail Corporation ("Conrail") seeks a permanent injunction preventing a threatened strike by the defendant Brotherhood of Maintenance of Way Employees ("BMWE" or "the Union"). Plaintiff also seeks a declaration by this court that, under the provisions of the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.*, the defendant is prohibited from striking

over issues that are "minor disputes", which are subject to the compulsory requirements created by Section 3 of the RLA, 45 U.S.C. § 153, for resolution of such disputes. Conrail also submits that the Union's concerns over safety issues must progress through arbitration pursuant to the Federal Railroad Safety Act ("FRSA"), 45 U.S.C. §§ 421–447. Finally, Conrail's Amended Complaint seeks declaratory and injunctive relief for the Union's breach of its duty under Section 2 First of the RLA to "make and maintain" agreements.[1] 45 U.S.C. § 152 First. The Union filed an Answer to Conrail's Amended Complaint on October 1, 1993.

Conrail has filed a Motion for Preliminary Injunction, in which it sought relief for the reasons set forth in its Amended Complaint. The Union opposed Conrail's Motion and filed a Motion to Dismiss under Fed.R.Civ.P. 12(c).

A hearing on these matters was held on December 14 and 15, 1993. At the hearing, the parties agreed to consolidate the preliminary injunction matter with the trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). *See* Trial Transcript, 12/14/93, at 3. The court then heard argument on the Union's Motion to Dismiss, and subsequently denied said Motion. *See* Trial Transcript, 12/15/93, at 13. The parties' proceeded to present evidence on the merits of the case.

At the conclusion of the above proceedings and upon request of the court, the parties submitted proposed findings of fact. After giving careful consideration to the parties' submissions, we have arrived at the following factual findings, which are fully set forth below.

## I. FINDINGS OF FACT

*A. The Parties.*

1. Plaintiff Conrail is a Pennsylvania corporation with its principal office at Two Commerce Square, 2001 Market Street, 17th Floor, Philadelphia, Pennsylvania. Conrail operates a railroad system in fourteen states and Canada, utilizing approximately 26,000 employees (including 22,300 employees covered by collective bargaining agreements), and is a "carrier" for purposes of the Railway Labor Act ("RLA").

2. Defendant BMWE is an unincorporated labor organization in which employees participate and which exists for the purpose of, among other things, dealing with carriers pursuant to the RLA concerning rates of pay, rules and working conditions, including negotiation and administration of collective bargaining agreements. The principal office of the International BMWE is located at Suite 200, 26555 Evergreen Road, Southfield, Michigan 48076–4225.

3. Defendant BMWE also is organized into subdivisions, known as Federations. Each Federation is directed by a General Chairman. All of the BMWE Federations and General Chairmen representing Conrail employees are named as defendants in this matter and are referred to hereinafter as "BMWE" or "the Union".

4. BMWE currently represents Conrail's employees who engage in work generally rec-

---

**1.** The Counts in Conrail's Amended Complaint closely follow the issues the Union presented to two of its local lodges in its July 14, 1993 strike authorization memorandum: Count I, breach of the 1992 Collective Bargaining Agreement's moratorium clause; Count II, the Union's "strike issue number 1," definition of production gangs; Count III, the Union's "strike issue number 2," clarification of qualifications for positions; Count IV, the Union's "strike issue number 3," the designation of fixed headquarters for heavy bridge gangs; Count V, the Union's "strike issue number 4," Conrail's violation of seniority district lines; Count VI, the Union's "strike issue number 6," Conrail's policy of leasing track to avoid the Union contract; Count VII, the Union's "strike issue number 7," Conrail's failure to provide clean camp cars; Count VIII, the Union's

"strike issue number 8," Conrail's unilateral promotion of employee involvement programs; Count IX, the Union's "strike issue number 9," Conrail's policy of listing multiple machines on single job advertisements; Count X, the Union's "strike issue number 10," Conrail's failure to provide impartial hearings before imposing disciplinary measures; Count XI, the Union's "strike issue number 11," Conrail's policy of contracting out work; Count XII, the Union's "strike issue number 5," safety issues over working conditions; Count XIII, seeking court enforcement of the Union's duty to "make and maintain" the parties' agreements as prescribed by the RLA. The parties agreed to dismiss without prejudice Counts VIII and X, which this court approved on December 14, 1993.

ognized as Maintenance of Way work, such as inspection, construction, repair and maintenance of Conrail facilities, including bridges, culverts, buildings and other structures, tracks, fences and roadbed.

5. Both Conrail and BMWE are actively doing business within the Eastern District of Pennsylvania.

### B. Historical Background.

6. A collective bargaining agreement between the parties has been in effect pursuant to the RLA since February 1, 1982 ("the 1982 Agreement"). (Parties' Joint Exhibit 1.)

7. The 1982 Agreement contains a three-step grievance procedure at Rule 26 for resolving employee claims and grievances. (Parties' Joint Exhibit 1.)

8. On or about June 10, 1988, BMWE served on Conrail notices under Section 6 of the RLA proposing that the parties' existing agreements and/or practices be changed in a number of ways. (Parties' Joint Exhibit 3; Plaintiff's Exhibit 31.)

9. BMWE supplemented its 1988 Section 6 notices on October 29, 1991 (Plaintiff's Exhibit 1) and January 30, 1992 (Plaintiff's Exhibit 2).

10. The parties bargained for several years over these proposals and other proposals exchanged by the parties. Eventually the parties exhausted the mediation procedures of the RLA, without reaching agreement. (Trial Transcript, 12/14/93, at 34.)

11. The National Mediation Board ("NMB") found pursuant to Section 10 of the RLA, 45 U.S.C. § 160, that the ongoing dispute between the BMWE and Conrail threatened substantially to interrupt interstate commerce to a degree such as to deprive various sections of the country of essential transportation service. The NMB notified President Bush of its findings. (Parties' Joint Exhibit 8, at 4 and Appendix A.)

12. President Bush appointed Presidential Emergency Board No. 221 ("PEB 221") pursuant to Section 10 of the RLA, 45 U.S.C. § 160, to investigate the dispute and report to him and the parties on the recommended settlement. (Trial Transcript, 12/14/93, at 34 (Swert); Parties' Joint Exhibit 8, at Appendix A.)

13. PEB 221 conducted several days of hearings and investigated the dispute between the parties. PEB 221 issued a thirty-eight page report ("the PEB 221 report") in May 1992, making findings and recommendations on all the issues in dispute. (Parties' Joint Exhibit 8.)

14. The PEB 221 report addressed each of the proposals made by BMWE, either expressly or by recommending to retain the status quo. All issues not mentioned in the Report were deemed withdrawn. (Trial Transcript, 12/14/93, at 35 (Swert); Parties' Joint Exhibit 8, at 37.)

15. After PEB 221 issued its report, the parties entered an agreement dated July 28, 1992 ("the 1992 Agreement"), amending and supplementing many of the provisions in the 1982 Agreement. (Parties' Joint Exhibit 2.)

16. Article XIV of the 1992 Agreement—known as the moratorium provision—provides for a multi-year period of labor peace by precluding efforts to coerce changes in agreements and practices. It provides in pertinent part:

(b) ... no party to this agreement shall serve, prior to November 1, 1994 ... any notice or proposal for the purpose of changing the subject matter of the provisions of this Agreement or which proposes matters covered by the proposals of the parties cited in Section 1(a) of this Article [i.e., the BMWE's Section 6 notices of April 2, 1984 and June 10, 1988 as supplemented by BMWE's proposals dated October 29, 1991 and January 30, 1992, and Conrail's Section 6 notices of April 9, 1984 and March 8, 1989], and any proposals in pending notices relating to such subject matters are hereby withdrawn ...

(c) Proposals that may be pursued in accordance with the various Articles of this Agreement are not affected by Section 1(b). Such proposals may be progressed within, but not beyond, the specific procedures for peacefully resolving disputes provided for in the relevant article of the Agreement that addresses such subject

matters or in the Railway Labor Act, as amended.

(d) ... no party to this Agreement shall serve or progress, prior to November 1, 1994 ... any notice or proposal which might properly have been served when the last moratorium ended on July 1, 1988.

(Parties' Joint Exhibit 2, at 16–17.)

*C. The Current Dispute.*

17. On July 14, 1993, the General Chairmen of two local BMWE Federations, the Pennsylvania Federation and Consolidated Rail System Federation, circulated a memorandum to its members. In that memorandum, Chairmen Jedd Dodd and James P. Cassese sought authority to conduct a strike over eleven "potential strike issues," which represent what the BMWE perceive to be issues "currently in dispute with Conrail." (Parties' Joint Exhibit 4; Trial Transcript, 12/15/93, at 15–16 (Dodd).)

18. The BMWE Federations did not send their July 14, 1993 strike authorization memorandum to Conrail or to any customers of Conrail. (Trial Transcript, 12/15/93, at 17 (Dodd).)

19. In particular, the BMWE July 14, 1993 memorandum requested strike authorization with respect to the following issues: (1) the definition of a production gang; (2) the designation of appropriate qualifications for positions; (3) meals and lodging for heavy bridge gangs in the Building and Bridges Department; (4) alleged violations of seniority district lines; (5) the right to strike in the event of railroad violations of the Rail Safety Act of 1970; (6) Conrail's policy of leasing track, which allows Conrail to avoid the union contract; (7) management's alleged failure in providing clean and sanitary camp cars and requiring members of the camp car to perform their own cleaning; (8) Conrail's unilateral promotion of safety, labor/management and quality programs for employees; (9) Conrail's practice of listing several machines on the same job advertisement; (10) employees' right to a fair and impartial disciplinary hearing; and (11) Conrail's practice of contracting out maintenance of way work. (Parties' Joint Exhibit 4.)

20. The July 14, 1993 BMWE Memorandum requested that "the Lodges meet and provide [the General Chairmen] with this strike authority now, so that at some time in the future, should it become appropriate, we can initiate strike action in an expeditious manner." (Parties' Joint Exhibit 4.)

21. The Union sought strike authority so that it could "exert greater leverage in bargaining with Conrail." (Parties' Joint Exhibit 4; Trial Transcript, 12/15/93, at 40 (Dodd).)

22. On or about September 21, 1993, the local lodges of the Pennsylvania Federation and Consolidated Rail System Federation cast their votes affirming authorization for a system strike under Article XX, Section 13 of the BMWE Constitution and Bylaws. (Parties' Joint Exhibit 33.)

23. No further steps have been taken by either Chairman Dodd or Cassese to obtain authority within the BMWE hierarchy as required by the BMWE constitution and by-laws to strike Conrail. (Trial Transcript, 12/15/93, at 19 (Dodd); at 53 (Cassese).)

24. Neither the Pennsylvania Federation nor the Consolidated Rail System Federation has BMWE constitutional authority to strike Conrail. (Trial Transcript, 12/15/93, at 19 (Dodd); at 53 (Cassese).

25. It would take a minimum of about 25 days for the BMWE to get the requisite authorization from its members and executives to call a strike. The process usually takes a few months. (Trial Transcript, 12/15/93, at 18–19 (Dodd).)

26. In the past, Conrail has asked the BMWE to provide advance notice before calling a strike. (Trial Transcript, 12/14/93, at 68 (Swert).) BMWE has refused prior requests and still refuses to provide Conrail with advance notice of a strike. (Trial Transcript, 12/14/93, at 68 (Swert); Trial Transcript, 12/15/93, at 31, 40 (Dodd).)

27. In a letter dated September 21, 1993, Chairmen Dodd and Cassese addressed Union membership and indicated that the Union is not "contemplating a strike in the near future and we have not even exhausted the other procedures in our By–Laws to authorize a strike. We do not have any plans to exhaust the other procedures in our By–

Laws to authorize a strike at this time. We are still analyzing these issues to determine the best course of action to take." (Parties' Joint Exhibit 33, at 2.)

28. On December 3, 1993, the BMWE submitted a proposal to Conrail for expedited arbitration of nine specific questions regarding two of the issues contained in the BMWE's July 14, 1993 strike authorization memorandum. (Parties' Joint Exhibit 30, Attachment A.) The BMWE's proposal included a provision at Paragraph 3 in which the parties would effectively waive their rights to object to the procedural disposition of the selected disputes prior to arbitration. (Parties' Joint Exhibit 30, at 2.) The BMWE's proposal would result in arbitration of those designated disputes without going through the on-the-property investigation steps, which are part of the existing grievance procedure under Rule 26 of the 1982 Agreement. (Parties' Joint Exhibit 30, at 2; Trial Transcript, 12/14/93, at 55–56 (Swert).) Chairman Dodd explained that the proposal was designed to expedite the resolution of the nine specified questions in a manner that permitted both the BMWE and Conrail to present all evidence relevant to the resolution of those questions. (Trial Transcript, 12/15/93, at 22 (Dodd).)

29. Defendant General Chairman Dodd admits that all of the disputes encompassed by the BMWE's December 3, 1993 proposal could be handled by the customary Rule 26 procedure in the 1982 Agreement, and subsequently, arbitrated before adjustment boards already established by the parties. (Trial Transcript, 12/15/93, at 31 (Dodd).) However, Defendant Dodd stated that the BMWE is not satisfied with the existing grievance procedure under Rule 26. (Trial Transcript, 12/15/93, at 22 (Dodd).)

30. In its 1988 Section 6 Notice, the BMWE proposed to "[e]stablish a progressive discipline/grievance program." (Joint Exhibit 3, Attachment A, # 5.) The BMWE did not, however, submit a proposal to change the Rule 26 procedure or the time limits for handling of grievances. (Trial Transcript, 12/14/93, at 118 (Domzalski); 12/15/93, at 32 (Dodd).)

31. The 1992 Agreement did not alter Rule 26 of the 1982 Agreement. (Trial Transcript, 12/14/93, at 71 (Swert).) The moratorium clause, Article XIV in the 1992 Agreement bars BMWE from serving a Section 6 Notice to change the Rule 26 grievance procedure for the period of the current contract, or until November 1994. (Parties' Joint Exhibit 2, at 16; Trial Transcript, 12/14/93, at 71–72 (Swert).)

32. On December 10, 1993, Conrail's Senior Director of Labor Relations Lipps responded to the BMWE's proposal, explaining that Conrail was amenable to following the steps of Rule 26 with respect to the disputes listed in Attachment A of the BMWE's December 3, 1993 letter. (Parties' Joint Exhibit 34.)

33. Conrail acknowledged that the parties may mutually agree to establish any particular agreement regarding any rule in the collective bargaining agreement. (Trial Transcript, 12/14/93, at 73 (Swert).) Nonetheless, it rejected the BMWE's December 3, 1993 proposal, stating only that if the selected disputes progressed through the requisite steps provided in Rule 26 and remained unresolved, they should proceed to arbitration. (Parties' Joint Exhibit 34; Trial Transcript, 12/14/93, at 60 (Swert).)

34. The BMWE presently is not refusing to resolve disputes either through conferences, the submission of claims, or arbitration. (Trial Transcript, 12/14/93, at 57–58, 65–66 (Swert); at 115–17 (Domzalski).)

35. The BMWE has not called upon any of its members to refuse to work for Conrail even under circumstances in which the BMWE has identified hazardous working conditions. (Trial Transcript, 12/15/93, at 24 (Dodd).)

36. With respect to the issues herein discussed, there has been no further strike vote, no strike date has been set, and the BMWE has not notified Conrail of any intention to strike. (Trial Transcript, 12/15/93, at 17, 19–20, 26–28 (Dodd); at 53 (Cassese); Parties' Joint Exhibit 33.)

### D. Effect of a Threatened Strike on Conrail.

37. According to testimony by Conrail National Sales Director Janice M. McNeal, Conrail lost approximately $15.2 million from business interruptions during the last period of labor unrest in June 1992. (Trial Transcript, 12/14/93, at 24 (McNeal).)

38. McNeal also testified that because Conrail is in a highly competitive business in which it must compete with a large number of other transportation companies such as the trucking industry, any disruption in Conrail's services could in time result in the permanent loss of customers' good will and future business upon which Conrail relies for its livelihood. (Trial Transcript, 12/14/93, at 24–27 (McNeal).)

39. Conrail National Sales Director McNeal admitted, however, that at present no shipper had taken business away from Conrail as a result of any actions taken by the BMWE with respect to the eleven issues cited in the BMWE strike authorization memorandum of July 14, 1993. (Trial Transcript, 12/14/93, at 27 (McNeal).)

40. In the BMWE's July 14, 1993 strike authorization memorandum, the BMWE recognizes that:

> ... even during a short strike or threatened strike, Conrail stands to lose substantial revenue. In addition, customers who have alternatives to ship other than rail, often will not deal with a railroad that has labor problems. This by itself puts tremendous pressure on management to resolve disputes rather than face continued unrest from the membership.

(Parties' Joint Exhibit 4, at 1–2.)

### E. Procedural Posture of Conrail's Present Civil Action.

41. On or about September 8, 1993, Conrail filed an Amended Complaint seeking declaratory and injunctive relief under the RLA against the BMWE's threatened job action over the disputes identified in the BMWE's July 14, 1993 strike authorization

memorandum, which Conrail perceived to be minor disputes.[2] Conrail also sought declaratory and injunctive relief under the Federal Railroad Safety Act ("FRSA") with respect to the issue identified as "Rail Safety Act Strikes" in the BMWE's strike authorization memorandum, to require the BMWE to follow the FRSA's mandate that such disputes be resolved by the procedures under Section 3 of the RLA. On or about October 8, 1993, Conrail filed a motion for preliminary injunctive relief. By stipulation of the parties, the hearing on Conrail's motion was consolidated with a trial on the merits, which also encompassed Conrail's request for a declaratory judgment. The hearing was held on December 14 and 15, 1993.

## II. DISCUSSION

### A. Injunctive Relief

The issues before this court are not unfamiliar. See Conrail v. Brotherhood of Maintenance of Way Employees, 781 F.Supp. 360 (E.D.Pa.1991); Conrail v. Brotherhood of Maintenance of Way Employees, 735 F.Supp. 1265 (E.D.Pa.1990). Unfortunately, we are again in the position of having to intervene in yet another labor dispute arising between these same parties. The plaintiff's Amended Complaint, as illuminated by the voluminous record and numerous memoranda of law submitted in this case, indicates that Conrail is again seeking an injunction and declaratory judgment against the defendant Union's alleged "threatened strike" over "minor disputes" in violation of the RLA, Section 3. 45 U.S.C. § 153. At this stage of our present review, we submit the now familiar brief resume outlining the legal landscape governing railroad labor disputes.

In order to obtain a permanent injunction against the defendant BMWE, Conrail must show both that the Union threatens to strike and such a strike would be unlawful under the Railway Labor Act, 45 U.S.C. §§ 151 et seq. Conrail can demonstrate this by showing that the Union has failed to follow the procedures mandated by the Rail-

---

2. The parties stipulated before trial to the dismissal of Counts VIII and X of Conrail's Amended Complaint, which dealt with Issues 8 and 10 of the BMWE's July 14, 1993 strike authorization memorandum.

way Labor Act for the particular type of dispute at issue, and that the Union has turned to precluded avenues of economic self-help.[3] *See Conrail v. Brotherhood of Maintenance of Way Employees,* 781 F.Supp. at 369. Beyond this, the district court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or *have been threatened* and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance. *See Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970) (citations omitted), *overruled on other grounds by Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

As an initial matter, we have no doubt that the issues presented in this action represent "labor disputes" within the meaning of § 13(c) of the Norris–LaGuardia Act, 29 U.S.C. § 113(c). It is also plain that § 4 of that Act, 29 U.S.C. § 104, would prohibit us from issuing an injunction if it is applicable to our functioning under the Railway Labor Act.

At this advanced stage of the RLA's development, the courts have thoroughly reviewed the interrelation of these two Acts. The Supreme Court has spoken with pristine clarity in holding that the Norris–LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. *Virginian R. Co. v. System Federation, etc.,* 300 U.S. 515, 563, 57 S.Ct. 592, 607, 81 L.Ed. 789 (1937); *Brotherhood of R. Trainmen v. Chicago R. & I.R.R. Co.,* 353 U.S. 30, 39–40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). The Supreme Court went on to say that there must be an accommodation of the Norris–Laguardia Act and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved, with the balance favoring the later and more limited one. *Id.; see also, Chicago & N.W. R. Co. v. United Transp. Union,* 402 U.S. 570, 582–83, n. 18, 91 S.Ct. 1731, 1738, n. 18, 29 L.Ed.2d 187 (1971).

It suffices to say that the Norris–LaGuardia Act can affect our present review only so far as its provisions are found not to render moot the requirements of § 2, First and § 3 of the Railway Labor Act, which mandates that railroads and unions "exert every reasonable effort to make and maintain agreements," 45 U.S.C. § 152 First, and sets

---

3. Case law construing the RLA defines two types of disputes which may arise between carriers and labor organizations, and the statute establishes distinct resolution procedures for each type of dispute. *See Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 722–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945), *followed in, Baker v. United Transp. Union,* 455 F.2d 149, n. 11 (3d Cir.1971), *interpreted in Local 553, Transport Workers Union v. Eastern Air Lines,* 695 F.2d 668 (2d Cir.1982). *See also Conrail v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). A "minor dispute" concerns the application or interpretation of a collective agreement and under § 3 of the RLA is subject to binding interpretation by the National Railroad Adjustment Board. 45 U.S.C. § 153; *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. at 722–27, 65 S.Ct. at 1289–92. A "major dispute" is one arising out of the formation or change of collective agreements covering rates of pay, rules, or working conditions. 45 U.S.C. § 155–156; *Elgin, J. & E.R. Co. v. Burley, supra,* at 722–27, 65 S.Ct. at 1289–92. If a dispute is deemed "major," and the parties cannot resolve their differences through negotiation, they must submit their dispute to the National Mediation Board,

and if dissatisfied with the results obtained there, proceed with more remedies outlined in the RLA. 45 U.S.C. § 155–56. Only after all major dispute proceedings have been exhausted may either party resort to self-help.

Conrail asserts that the disputes in the current action arise out of Conrail's interpretation and application of collective bargaining agreements between the parties, Conrail's administration of its safety program, and longstanding practices related thereto. As such, Conrail argues that the disputes, which are the subject of Counts I through VIII, IX and XI, are "minor disputes" under the RLA and are thereby subject to the compulsory minor dispute provisions of the RLA. Moreover, plaintiff claims that the Union's "threatened strike" is also a violation of the mandate in Section 2 First of the RLA, which requires the Union to exert every reasonable effort to maintain agreements. Finally, Conrail states that the FRSA requires arbitration of disputes over whether railroad operations present imminent danger of death or serious injury as to justify a refusal to work. *See* Memorandum of Law by Plaintiff in Support of Application for Declaratory Judgment and Permanent Injunction, at 1–3.

forth the required procedure for resolving "minor disputes." 45 U.S.C. § 153.

■ It is true enough that, as said in the *Virginian Railway* case, *supra*, 300 U.S. at 563, 57 S.Ct. at 607, the Norris–LaGuardia Act does not deprive the federal courts of jurisdiction to enjoin compliance with the various mandates of the RLA, but we also note that this exception is necessarily a limited one. Even when a violation of a specific mandate of the RLA is shown, "[c]ourts should hesitate to fix upon the injunctive remedy ... unless that remedy alone can effectively guard the plaintiff's right." *International Ass'n of Machinists v. Street*, 367 U.S. 740, 773, 81 S.Ct. 1784, 1802, 6 L.Ed.2d 1141 (1961). Moreover, not all provisions of the Norris–LaGuardia Act are rendered nugatory by the Supreme Court's rulings. Indeed, we find in this case that the requirements of § 9 of the Norris–LaGuardia Act are especially relevant:

> every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in ... findings of fact made and filed by the court.

29 U.S.C. § 109. The evident purpose of this section was not to preclude mandatory injunctions, but to forbid blanket injunctions against labor unions, which are usually prohibitory in form. *See Virginian R. Co. v. System Federation, etc.*, 300 U.S. at 563, 57 S.Ct. at 607.

■ When an injunction is sought, judicial restraint is called for not only by the scheme and structure of the RLA but the Norris–LaGuardia Act as well. An injunction should not issue unless there is "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). When we granted Conrail's previous two injunction requests, such a danger plainly existed. In 1991, the Union had received nearly one hundred percent approval from all lodges to support a strike, the Union also had informed Conrail and the general public that a work stoppage would be conducted, the General Chairmen of the local Federations had requested strike approval from the BMWE executive committees, and the Union stipulated that it intended to strike on January 1, 1992. *See Conrail v. Brotherhood of Maintenance of Way Employees*, 781 F.Supp. at 367–68. In the Conrail suit brought in 1990, counsel for the BMWE stated at oral argument that the Union conceded that it was, in fact, threatening a strike and a strike date had been set. *See Conrail v. Brotherhood of Maintenance of Way Employees*, 735 F.Supp. at 1266.

■ Conrail emphasizes that because this is the *third* time the parties have been before the court in connection with the Union's "strike threats," this court cannot expect the Union to comply with statutory mandates without a permanent injunction order. We agree with the plaintiff insofar as the Supreme Court has instructed us to consider, in a review of a request for injunctive relief, "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *United States v. W.T. Grant Co.*, *supra*, 345 U.S. at 633, 73 S.Ct. at 898. We also agree with Conrail that the Union in the past has threatened strikes over issues communicated to management in notices of proposed changes to bargaining agreements, which are authorized by the RLA under Section 6 of that statute. 45 U.S.C. § 156. We refuse to conclude from this past activity, however, that the Union has a proclivity to strike over every arbitrable grievance and that a broad injunction is mandated.

■ To sustain a prospective injunction, a court must make detailed findings concerning the pattern of past work stoppages and the likelihood of their recurrence under the specific set of facts presented to the court, and relate those findings to the legal framework governing the labor dispute (here, the RLA). *See United States Steel Corp. v. United Mine Workers*, 534 F.2d 1063, 1077 (3d Cir.1976) (in § 301 suit under Labor

Management Relations Act, holding that court may grant prospective injunction, but only if it specifically finds on evidence in the record that types of violations that have occurred in past are likely to recur, or finds that new and different kinds of violations are expected to occur in future). A union's past action alone cannot be the basis for enjoining future conduct. A court must also find sufficient indicia of an intended job action in a current dispute. The best evidence of such an intention is the ultimatum of a strike date. Because unions are not always so formal about their intentions, however, courts should look to specific communications between a union and the carrier for warnings of future unilateral action, or refusals to participate in mediation or arbitration, or ongoing conduct within the union to prepare for and pursue self-help.

A court called on to classify infant disputes between a carrier and union and to issue blanket injunctions runs a grave risk of becoming ensnarled in the private relationship of the parties and substituting its interpretation of the collective bargaining agreement for that of the arbitrator or mediator. An injunction ordered on issues that are unripe for determination inhibits the exercise of important employee rights and induces the carrier to resort to the courts for injunction orders rather than to concentrate efforts in negotiation. Thus, creating incentives for carriers to come to the courts as a means of *first* resort, sacrifices the national policy of avoiding interference in the private economic affairs of the parties without furthering the cause of compromise and agreement.

**4.** A third BMWE Federation of Conrail employees, the Northeastern System Federation, has taken no action with respect to the July 14, 1993 strike authorization letter. *See* Defendant's Reply Brief, at 18.

**5.** Conrail also suggests that the BMWE's December 3, 1993 proposal for expedited arbitration is evidence of the Union's failure to "exert every reasonable effort to … maintain agreements" as required under Section 2 First of the RLA. 45 U.S.C. § 152 First. We do not agree. Conrail acknowledges that the parties may mutually agree to establish any particular agreement with respect to any rule in the collective bargaining agreement. Findings of Fact, 33. Although the BMWE's arbitration proposal contains a waiver

With respect to the issues herein discussed, the Union has not notified Conrail of any intention to seek self-help in resolving any of the grievances currently pending before Conrail, no strike date has been set, and the General Chairmen of the two local Federations, which authorized a strike on eleven general issues, have testified at trial that they have no intentions of seeking further strike authorization against Conrail.[4] Findings of Fact, 18, 23–24, 27, 34–36. In fact, the only evidence presented by Conrail of the BMWE's threat to strike is a letter that was circulated internally to two local Federations on July 14, 1993 seeking initial strike authority on eleven broad working condition issues. Findings of Fact, 17–18. Conrail could not point to any action taken by the Union to follow up on its strike authorization letter.[5] Findings of Fact, 34–36.

Indeed, the defendants, specifically the General Chairmen from the two local Federations that voted on strike authorization with regard to the aforementioned eleven issues, have contended before this court that there is no need for an injunction because the Union is not threatening a strike against Conrail. General Chairman of the Pennsylvania Federation of the BMWE, Jedd Dodd, gave the following testimony at trial, which we reproduce here in pertinent part: ·

Q: Speaking today, regarding the current actions that Conrail has taken, do you have any intention as general chairman of the Pennsylvania federation of seeking to implement the further strike authorization steps under Article 20?

provision to bypass on-the-property investigations, which are part of the dispute resolution procedures contained in Rule 26 of the 1982 Agreement, Conrail admits that it can agree to such a term. *Id.* Moreover, there is no record evidence that the BMWE has issued any threat to strike Conrail if the carrier refused to agree to expedited arbitration. In fact, Conrail did reject the BMWE's proposal in a letter dated December 10, 1993, stating only that if the selected disputes progressed through the requisite steps provided in Rule 26 and remained unresolved, they would proceed to arbitration. *Id.* The BMWE has not indicated that they intend to resort to self-help as a result of this decision.

A: No.

\* \* \* \* \* \*

Q: And assuming that a particular action that's been taken is deemed to be major are you going to automatically seek strike authority?

A: No.

Q: What other steps could you take?

A: I could approach the company and attempt to resolve it, like we basically have done every other time in the past. Just a multitude of avenues at our disposal to attempt to resolve these disputes and could even offer to arbitrate the disputes.

Q: Do you wish to resolve the disputes peacefully?

A: Yes.

Trial Transcript, 12/15/93, at 20–21 (Dodd).

The General Chairman of the BMWE's Consolidated Rail System Federation, James P. Cassese, offered similar testimony:

Q: \* \* \* Do you have any present intention of seeking strike authorization under Article 20, Section 13 of the constitution, the BMWE constitution regarding any specific action that Conrail is taking as of today?

A: Absolutely not.

Q: Does your federation have authority under the constitution to strike today?

A: Absolutely not.

Trial Transcript, 12/15/93, at 53 (Cassese).

 In view of the limited action taken by the BMWE to pursue possibly prohibited economic self-help and the unequivocal representations made by the local Federations' General Chairmen at trial, which we expect to be fulfilled, we cannot find that the threat of a strike is now so real or imminent as to warrant a permanent injunction.[6] Such strong medicine as a broad injunction goes too far given the present posture of this action. The courts' narrow exception to the Norris–LaGuardia Act's prohibition on injunctions would expand to swallow the rule were we to grant plaintiff's injunction request on the scant evidence in this record.

Despite our finding here, however, it is important that there be no strike that would directly frustrate the will of Congress, and also that shippers should perceive Conrail as being as free as possible from the likelihood of such a strike. Otherwise the efforts of

---

6. Conrail refers to an opinion by Judge Plunkett of the United States District Court for the Northern District of Illinois, in which the District Judge rejected the proposition that because a strike had not been fully authorized under the Union's constitution, the time was not ripe for an action by the court. *Brotherhood of Maintenance of Way Employees v. Atchison, T. & S.F. Ry.*, 840 F.Supp. 1221 (N.D.Ill.1993) ("We do not believe that it serves any purpose to force the railroads to wait until the trigger is pulled before seeking the protection to which they are entitled"). We note initially that Judge Plunkett's decision is not controlling in this court and, moreover, find the decision in that case unhelpful here. In *BMWE v. Atchison*, the Union already had gone far down the road to calling a strike. In that case, the BMWE had begun informational picketing, the BMWE's president notified the railroads that the BMWE "will feel free to take whatever appropriate course of action" that they felt necessary, and the BMWE president advised local Federation chairmen that they were "free to strike." *Id.* In fact, the railroads withdrew a motion for a temporary restraining order against the Union because the Union agreed to forbear self-help until the disposition of the pending court action. Under those circumstances, it would be disingenuous for a court to hold that the suit was unripe for injunctive relief merely because no strike date

had been set and no formal authorization from the Union president received.

In the present case, however, we are confronted with none of those facts from which Judge Plunkett made his ruling in *Atchison*. Indeed, in the instant action we have testimony by the local Federation chairmen that they have no intentions to strike, and we have no communication between the Union and railroad that suggests otherwise. No action was taken by the Union after circulating the July 14, 1993 strike authorization letter, and nearly eight months have since passed.

We additionally note that Judge Reed from this court recently enjoined a union from calling a strike on Conrail. *Consolidated Rail Corp. v. United Transp. Union*, 1994 WL 4467, 1994 U.S.Dist. LEXIS 163, Civil Action No. 93–5366 (Reed, J., E.D.Pa., January 6, 1994). That case, however, is also unavailing to the facts on our record. In that case, although the International President of the UTU refused to grant strike authority to the local Federation, the local chairman nonetheless stated his intention to strike Conrail in correspondence both to the UTU International President and to Conrail directly. Moreover, in that case, the UTU provided the clearest sign of an imminent threat—it set a strike date.

Congress to enable Conrail to achieve profitability might be seriously jeopardized. We therefore think it desirable to alert the parties to our present inclination on the record thus far, in the event that an illegal strike should be actually threatened, to issue immediately a temporary restraining order and then to provide Conrail with other appropriate relief.[7]

## B. Declaratory Relief

■ Turning now to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, we find that such relief is available if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826, 829 (1941); *1st Westco Corp. v. School Dist. of Philadelphia*, 6 F.3d 108, 113 (3d Cir.1993). In order to find a controversy of such "immediacy and reality" under the facts presented here, the court would have to impute a substantial strike threat to the Union. In this situation, for the reasons detailed in our denial of injunctive relief above, the plaintiff cannot cross the jurisdictional threshold.

■ To grant the relief here requested would as we see it constitute a futile and premature intervention in a field of public law and would result in a ruling reaching far beyond this particular case. The differences of opinion reflected in this suit are not ripe for determination and are too nebulous and contingent for classification as part of a declaratory judgment. *Compare Conrail v.*

*Brotherhood of Maintenance of Way Employees*, 781 F.Supp. at 360; *Conrail v. Brotherhood of Maintenance of Way Employees*, 735 F.Supp. at 1265.

■ The courts should think hard and long before undertaking to pass upon all differences of opinion which arise during the grievance process between the representatives of labor and management. In our judgment the RLA and FRSA contemplate no such recourse to the courts. The provisions of these two Acts reveal Congress' intent to rely heavily on negotiation and mediation rather than on adversary proceedings for resolving railroad disputes. We must proceed cautiously so as not to "overstep[ ] the bounds of the courts' limited role under the RLA." *Railway Labor Executives' Ass'n v. Chicago and Northwestern Transportation Co.*, 890 F.2d 1024, 1032 (8th Cir.1989). The courts must hesitate to make rulings which may be used subsequently by the parties, mediators or arbitrators, as interpretations of collective bargaining agreements. *See, Order of R. Conductors v. Pitney*, 326 U.S. 561, 566–67, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946); *Slocum v. Delaware, L. & W.R.R. Co.*, 339 U.S. 239, 242–43, 70 S.Ct. 577, 579, 94 L.Ed. 795 (1950). In the present case, this court is ill-equipped to rule upon eleven general issues that are still being reviewed, in more specific forms than articulated in the BMWE strike authorization memorandum, under the parties' established grievance procedures.[8]

■ It is highly problematical whether any useful purpose would be achieved by passing upon these parties' present conten-

7. We realize that at this point counsel for the Union have not suggested what, if any, new arguments could be made, in the event of a renewed threat of a strike, that *might* lead us to deny a temporary restraining order or a preliminary injunction with regard to the eleven issues in the BMWE's July 14, 1993 strike authorization letter. Our inclination should thus not be taken as final or to reflect fully on the appropriateness of injunctive relief when and if a proper showing has been made that a strike is likely—an event we trust will not occur. We hold only that at the present time injunctive relief is not appropriate.

8. In fact, the parties stipulated at the time of the trial that they had reached agreement on two of

the eleven issues in the BMWE strike authorization memorandum, i.e., issue number 8, Count VIII of plaintiff's Amended Complaint, regarding Conrail's promotion of employee involvement programs, and issue number 10, Count X of plaintiff's amended complaint, regarding Conrail's disciplinary procedures. *See* Plaintiff's Proposed Findings of Fact, at 12, n. 4. In addition, the parties are in the process of finalizing an arbitration agreement with respect to a third issue, issue number 2, Count III of plaintiff's Amended Complaint, regarding Conrail's requirement that, for certain positions, employees must hold commercial drivers' licenses. *See* Trial Transcript, 12/14/93, at 57 (Swert).

tions. A declaratory judgment today with respect to the eleven controversial issues could result in a change in their phraseology and a request for a new declaratory judgment tomorrow. Even under the Declaratory Judgment Act courts cannot render advisory opinions. *See, Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979); *Maryland Casualty,* 312 U.S. at 273, 61 S.Ct. at 512 ("The difference between an abstract question, and a 'controversy' ... is necessarily one of degree....").

 ▌ Because we find that there is no immediate threat of a strike by the BMWE against plaintiff, we decline to pass judgment on the declaratory judgment claims brought by Conrail in this action until all voluntary processes of negotiation, conciliation and mediation have run their course. Of course, should plaintiff's worst fears materialize and a strike become imminent, this court would then review the specific dispute and determine whether the Union was resorting to a precluded form of self-help.

* * *

We conclude by referring the parties to the Supreme Court's general admonition against illegal strikes:

> In some cases, these strikes are encouraged or even instigated by union leaders. Often, however, they are true "wildcats"— strikes that arise spontaneously to protest grievances against the company and, occasionally, against the union leadership itself. Responsible unions disapprove of such strikes, but some officials, *especially those at the local level,* may acquiesce in them because of the fervor of intransigent members.
>
> Whatever the cause, strikes in breach of [collective bargaining agreements] frequently injure all concerned: the employer, employees, and the public. Strikes and lockouts by their nature squander human working capacity, the full use of which is essential to the enjoyment of the Nation's productive potential. To be sure, the national labor policy recognizes that, in some circumstances, the use of weapons of strike and lockout is consistent with and protected by law. Labor, management, and the

public nevertheless share a "common goal of uninterrupted production." The essential tenet of . our labor policy is that a "system of industrial self-government" based on consensual (albeit vigorously negotiated) labor contracts, is preferable to "strikes, lockouts, or other self-help."

*Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, 418–19, 101 S.Ct. 1836, 1846, 68 L.Ed.2d 248 (1981) (citations omitted) (emphasis added).

 ▌ The Third Circuit has noted that railroad carriers and labor alike have a special statutory obligation under the RLA to "channel labor disputes into constructive resolution procedures as a means of avoiding interruptions to commerce and preventing strikes." *General Committee of Adjustment, United Transportation Union, etc. v. CSX Railroad Corp.,* 893 F.2d 584, 589 (3d Cir. 1990) (citations omitted). That responsibility is not consistent with such actions as a deliberate timing of a strike without prior warning, with the purpose of enhancing plant damage. Such actions are identified with jungle warfare, not earnest bargaining.

Finally, we note that this court retains jurisdiction to reappraise the Union's good faith in light of either substantial evidence not previously available or developments as to tactics and methods that indicate the Union's intentions to apply otherwise precluded means of economic self-help. Although we find here that the sufficient indicia of a threatened strike is lacking on this record, we strongly caution the Union that any further action indicating the pursuit of self-help may lead us to grant injunctive relief to Conrail.

## III. CONCLUSIONS OF LAW

1. Plaintiff Consolidated Rail Corporation and the Defendant Brotherhood of Maintenance of Way Employees are parties to a collective bargaining agreement.

2. Conrail and the BMWE Union are engaged in the process of resolving a number of grievances either through conferences, the submission of claims, or arbitration, pursuant

to the procedures specified in the Railway Labor Act, 45 U.S.C. § 151 *et seq.*

3. Despite the circulation of its July 14, 1993 strike authorization memorandum to two local Federations, the BMWE has not pursued, is not currently pursuing, nor intends to pursue economic self-help in support of its positions to resolve grievances with Conrail. The General Chairmen of the two local BMWE Federations mentioned above, have made unequivocal representations that they have no intentions to call a strike.

4. The threat of a job action by the BMWE on Conrail is not real or imminent.

5. Because Conrail faces no substantial strike threat from the BMWE Union, the disputes presented in this suit are not of "sufficient immediacy and reality" to merit declaratory relief at this time.

## IV. CONCLUSION

For the reasons outlined in the foregoing memorandum, we will deny plaintiff's motion for a strike injunction and declaratory judgment on all counts in its Amended Complaint.

An appropriate order follows.

### *ORDER*

AND NOW, this 28th day of March, 1994, upon consideration of Plaintiff's Motion for Preliminary Injunction and Declaratory Judgment, and its submissions in support thereof, and Defendants' opposition thereto, and their submissions thereof, and after hearing testimony in open court, and for the reasons set forth in the Memorandum issued herewith, it is hereby **ORDERED** that Plaintiff's Motion is hereby **DENIED WITHOUT PREJUDICE. IT IS FURTHER ORDERED** that Plaintiff's complaint is hereby **DISMISSED WITHOUT PREJUDICE,** consistent with the foregoing Decision. Defendants' Motion to Strike Plaintiff's Proposed Conclusions of Law is **DISMISSED** as moot.

This case is **CLOSED.**